## Persch *versus* Quiggle. Hepburn's Appeal.

| 57 | 247 |
| 147 | 629 |
| 57 | 247 |
| 201 | 475 |
| 57 | 247 |
| 208 | 609 |
| 57 | 247 |
| 212 | ²423 |
| 28 SC | ⁷510 |

1. It is not multifariousness, if a bill seek an account of stock bailed and its product from the bailee and those who have received it, and does not join distinct and independent matters mediately or immediately from him.

2. Multifariousness should be objected to by demurrer, it is too late to object at the hearing.

3. Where a person was a general agent for another for the custody and management of stock delivered to him, and for collection of its dividends, &c., an action of account render might be maintained against him as bailiff and the Act of October 13th 1840 (Equity), makes it a case for chancery jurisdiction.

4. An agent without reward, or bailee without hire, responsible only for

[Persch *v.* Quiggle.]

the most ordinary care, cannot use the bailment for his own purposes or needlessly expose it.

5. Lending stock for the bailee's own purposes and not for the benefit of the bailor, is a conversion and breach of trust.

6. Especially when the principal is a married woman, should her agent observe the strictest good faith towards her.

7. A trustee or agent dealing with the property of the *cestui que trust* or principal, cannot divert it to purposes foreign to the trust or agency without the utmost openness and frankness with the party beneficially interested.

8. An agent can derive no advantage from anything done by the principal in ignorance of what it was the duty of the agent to communicate. In any agreement made with the principal which released the agent, he must show that the principal knew the actual condition of his property.

9. A decree that two of the defendants pay a sum named, and *costs*, and dismissing the bill as to the other defendants, carried against the two, *all* the costs that the plaintiffs had incurred in the prosecution of their bill.

10. If this was error it should have been assigned in the Supreme Court on appeal from the decree.

11. The taxation of the costs was only the ascertainment of the *amount* to be paid:—the right of the plaintiffs to recover from the defendants *all* their costs could not be then readjudicated.

February 14th and 15th 1868.    Before THOMPSON, C. J., STRONG, AGNEW and SHARSWOOD, JJ.    READ, J., at Nisi Prius.
Certificate from Nisi Prius.

This was a bill in equity by James W. Quiggle and Cordelia his wife, filed October 25th 1864, against John P. Persch and Frederick Steeb, partners, under the firm of Persch & Steeb, Samuel Hepburn, Joseph N. Peirsol, cashier, the Consolidation Bank and the West Branch and Susquehanna Canal Company.

The bill alleged, that in 1859 Mrs. Quiggle owned 100 shares of the stock of the West Branch and Susquehanna Canal Company, which, together with a blank power of attorney executed by her, she left for safe keeping with Samuel Hepburn, as she was about going to Europe, until demanded on her return; that after her return, in November 1861, she frequently asked him for her stock, but was told by him that it was safe and that he would keep it safely for her, whereas the stock was not then in his possession, he having pledged it to various brokers as collateral security for money borrowed by him; that on the 13th of May 1863, Mr. Quiggle borrowed $2500 from the defendants Persch & Steeb, who afterwards gave him a receipt for the stock as security for the loan; that the receipt was given without her knowledge and consent; that at the date of the receipt the stock was not delivered to Persch & Steeb, was not then nor afterwards, nor had at any time, been in the possession of Persch & Steeb; that she had not authorized the loan, nor did she receive any part of it, or know of it or of the pretended pledge by her husband until the following October; that Mr. Quiggle knew nothing of the stock after it had been originally delivered to Hepburn, and that Persch & Steeb practised a fraud on him in pretending that

they had the stock in their hands at the date of the receipt; that in October 1863, Mr. Quiggle tendered to Persch & Steeb the amount borrowed from them and demanded the return of the stock, which was refused on the ground, as stated by Steeb, that the firm had not then and never had the stock, that it had been given in some way by Hepburn to Persch and he had pledged it to the Consolidation Bank; that Hepburn, without the plaintiffs' knowledge, used the stock for his own benefit, and had pledged it to E. W. Clark & Co. for money borrowed by him, and afterwards authorized Persch, or Persch & Steeb, to receive the stock from Clark & Co.; that it had been delivered by Persch to the Consolidation Bank as security for loans by the bank to Persch, and was finally transferred on the books of the canal company, and a new certificate issued to Joseph N. Peirsol, cashier of the bank, under the authority, as the plaintiffs believe, of the blank power of attorney given by her to Hepburn with her stock. The bill averred, that Mrs. Quiggle was kept in ignorance of all these matters by the defendants who had used her stock, and that the defendants knew she was a married woman, and had received no value for the stock and had not legally authorized any one to assign or transfer the same for her or on her account, and that any actual or pretended transfer thereof was void.

They prayed for a decree against Persch & Steeb and Hepburn to account to her for the value of the stock, against Peirsol and the bank to transfer the stock to her, and against the canal company to account to her for the stock, and for general relief.

Persch answered, that he could not say whether the receipt had been given for Mrs. Quiggle's stock; that it had been given by Steeb in his absence and without his knowledge; that the stock had been delivered to him by Hepburn in consideration of 1 per cent. per month for every $1000 worth of stock to be paid by him to Hepburn for the right of using it as collateral security for money to be borrowed for Persch; that he believed the stock was Hepburn's; that he pledged it at the Consolidation Bank, first as a general collateral, and then for his own note of $24,000; he learned for the first time from Mr. Quiggle, in 1863, that "Cordelia Quiggle" was a married woman and his wife.

Samuel Hepburn, in his answer, denied that the stock was left with him for safe keeping and that he used it for his own benefit and profit, and he averred that it, with other stocks and personal property belonging to James W. Quiggle, was left with him to sell, pledge or use in any way he might think best for the interests of the plaintiffs, or in order to raise money to pay their debts here and to remit to them abroad as they might require it; that he raised and remitted to Mrs. Quiggle, and paid for her here, various sums of money upon the security of her stock, and that it was always in his hands or under his control until sometime in

[Persch *v.* Quiggle.]

the fall of 1862, when he loaned it for a few days to John P. Persch, who promised to place it at the expiration of that time in the safe of Persch & Steeb, there to be kept until called for by him; that he informed Mrs. Quiggle of the loan, and, after receiving assurance from him, Hepburn, that Persch was worthy of confidence and credit, she was satisfied; that both of the plaintiffs knew that the stock was so left with Persch, and neither of them ever made any objection to the loan or to the stock being left in the safe of Persch & Steeb, but both expressed themselves satisfied that the stock was safe in the hands of that firm.

That in March or April 1863, when the firm was in good credit, and when he was endeavoring to obtain and could have obtained the stock from Persch, to deliver to Mrs. Quiggle, he was prevented by the acts of the plaintiffs, who refused to permit him to insist upon Persch's returning the stock, and Mr. Quiggle, with the consent of Mrs. Quiggle, undertook to arrange with Persch for the stock, and relieved and released the respondent from all liability or responsibility for or on account of the same. That afterwards and up to the time of the failure of Persch & Steeb, in November 1863, he frequently saw the plaintiffs, and he never heard or knew that the stock was not in the hands of Mrs. Quiggle; he believed it had been arranged for satisfactorily to them, and she never asked the return thereof from him until after the failure of the firm.

Joseph N. Peirsol and the Consolidation Bank in their joint and several answer, admitted that the stock had been transferred and a new certificate therefor issued to Joseph N. Peirsol, cashier of the bank, and they averred that the stock, with a power of attorney to transfer the same, purporting to be for value, signed by Mrs. Quiggle, and witnessed by Mr. Quiggle, was received from John P. Persch by the bank prior to September 1862, in good faith, without any knowledge that Mrs. Quiggle was a married woman, or that any fraud had been committed by any person whomsoever on the plaintiffs or either of them, as a general collateral security for loans to be made by the bank to Persch and for sums to be drawn from the bank by him, and that Persch, upon the credit of the stock, obtained one loan of $24,000, another loan of $6500, and in addition drew from the bank the further sum of $24,000, making in the aggregate the sum of $54,500, whereof he still owes the sum of $31,212.95, with interest.

The West Branch and Susquehanna Canal Company, in their answer, averred that the transfer of the stock to Joseph N. Peirsol, cashier, was made in the ordinary manner, in the ordinary course of business, in good faith, and without knowledge by them, or their treasurer, by whom as attorney in fact of Mrs. Quiggle, the transfer was made on October 16th 1863, of any fraud, deceit

or bad faith on the part of any person or persons in procuring or using the power of attorney to transfer the stock attached to the original certificate thereof, and under and by authority of which the stock was transferred, nor did they know that the transfer was in violation of any existing law, or in fraud of the rights of Mrs. Quiggle.

The master found the following to be the facts of the case:—

In 1859 Cordelia Quiggle, wife of James W. Quiggle, was the owner in her own right, as her separate property, of 100 shares of the capital stock of the West Branch and Susquehanna Canal Company.

On June 6th 1859 Mr. Quiggle, preparatory to going abroad with his family as consul to Antwerp, left with Samuel Hepburn, one of the defendants, certain stock and personal property, among which were the 100 shares above mentioned belonging to his wife, for which he gave a receipt, specifying that it was valued at $10,000, and belonged to Mrs. Quiggle.

On or about the same day Mr. and Mrs. Quiggle executed to Hepburn a full and general power of attorney, and Mrs. Quiggle, with the knowledge and consent of her husband, attested by his subscribing as a witness, voluntarily executed and left with Hepburn two special powers of attorney, one authorizing him to receive and receipt for all dividends on stock standing in her name, to appoint substitutes for that purpose, and the other the customary blank power of attorney to sell and transfer stock without date or the number of shares or the names of the company, attorney or assignee inserted or mentioned therein, but intended by her to be used in disposing of her said stock if her interests or necessities should require it.

About January 1st 1860, the capital stock of the canal company was increased from $600,000 to $1,000,000, the old certificates were exchanged for new certificates, and Hepburn received and receipted for 816 shares, viz. 163 for Mrs. Quiggle, 490 for Mr. Quiggle, and 163 for himself.

On August 9th 1860 Hepburn, then at Antwerp, rendered an account to the plaintiffs of money paid, viz., $17,250.57, and received, viz., $10,753.10, by him for Mr. Quiggle, showing a balance of $6497.47 in his own favor. On May 31st 1860, in this account, he credited Mr. Quiggle with $1855 as the value of 53 shares of the stock.

On the same day he gave to Mr. Quiggle a receipt, wherein after reciting the increase of the capital stock of the canal company and the exchange of certificates, he acknowledged that he had received 653 shares, of which he had transferred to himself 53 shares as per account above mentioned, and that he still held the balance, to wit, 600 shares, for Mr. and Mrs. Quiggle as per certificates.

[Persch *v.* Quiggle.]

On the same day he gave to Mr. Quiggle $500, and received from him his two promissory notes, made " only as an accommodation," dated at Philadelphia on September 3d 1860, for $500 each.

Shortly afterwards Hepburn returned to the United States, and continuing to act as the general agent of the plaintiffs, supplied them from time to time with money, of which they appear to have been much in want, and which he was earnestly solicited by both of them to raise and remit at almost any cost. But no part of the money thus sent to them was obtained by any pledge of the said stock belonging to Mrs. Quiggle.

In November 1861 the plaintiffs returned to Philadelphia.

The dividends on the stock from January 1860 to January 1862, inclusive, were paid to Hepburn, and from July 1862 to July 1863, to the attorneys in fact of Mrs. Quiggle.

About February 19th 1862, Hepburn, without the knowledge of the plaintiffs, loaned 100 of the shares of the stock belonging to Mrs. Quiggle, and 300 other shares of the stock of the canal company, to John P. Persch, of the banking firm of Persch & Steeb, who executed to him a judgment-bond for $60,000, as security for the prompt return of the stock, &c.

Some time in the spring or summer of 1862, Persch pledged the 100 shares of stock belonging to Mrs. Quiggle to the Consolidation Bank, as a general collateral for money to be loaned to him by the bank, or to be drawn by him from the bank, and thereupon or afterwards, Joseph N. Peirsol, cashier of the bank, inserted his own name as cashier, the name of the canal·company and the number of shares, in the blank power of attorney executed by Mrs. Quiggle and accompanying the certificate of the stock.

In the spring of 1863, when the stock stood with other securities pledged to the bank for over $30,000, loans and discounts to Persch, and while Hepburn was unsuccessfully endeavoring to obtain the same from him, Mrs. Quiggle, under the belief that her stock was in the fire-proof of Persch & Steeb, deposited as a place of safe keeping, and in ignorance of the pledge thereof to the bank, yielded to the importunities of her husband, and consented that he might lift the stock.

Accordingly on May 13th 1863, Hepburn and Quiggle went to the office of Persch & Steeb, and Persch and Hepburn having first arranged some undisclosed private matters, Persch, within ear-shot of Hepburn, requested Steeb to give a receipt in the name of the firm for 100 shares of the stock of the canal company, which he said " he had at the Consolidation Bank, that it belonged to Judge Hepburn formerly, but that he had returned it to Mr. Quiggle, who wanted to borrow some on it." Steeb objected, that the firm ought to have the stock in their safe keep-keeping; to which Persch replied, " that he could get it whenever

[Persch v. Quiggle.]

he wanted it, and it was as safe in the bank as it would be in the office;" whereupon Steeb for the firm, gave to Quiggle a receipt for 100 shares of the stock, in the name of Cordelia Quiggle, held as collateral for the payment of his two promissory notes to the firm for money lent to him, one.for $1000, and the other for $1500.

The firm of Persch & Steeb never had possession of the stock; it had been lent by Hepburn to Persch individually, and by him pledged on his own individual account to the bank.

It did not appear that Hepburn ever had any dealings with the firm; he dealt with Persch alone, and lent stocks to him for profit; he so lent Mrs. Quiggle's stock, Mr. Quiggle's stock and his own stock. Persch paid him for the use of it, and pledged it to raise money.

Persch & Steeb were at this time believed to be a firm of good credit, but the only evidence of Persch's individual condition was that his credit was in a great measure, if not entirely, sustained by the use of these stocks obtained from Hepburn.

On August 29th 1863, the Consolidation Bank, on the security of the 100 shares and other stocks (then held as collateral for about $13,000), discounted for Persch two promissory notes, one his own note for $24,000, and the other the note of Miller & Persch (of which firm he was a member) for $6500, and Persch, at the request of the bank, inserted the date of that day in the blank power of attorney executed by Mrs. Quiggle and accompanying her stock.

On October 5th 1863, Persch deposited in the bank, and drew the proceeds of a check of the firm of Persch & Steeb for $24,000 on the Tradesmen's Bank, which was returned on the following day "not good."

On October 16th 1863, at the request of the Consolidation Bank, Francis T. Carpenter, treasurer of the canal company, inserted his own name as attorney in the blank power of attorney executed by Mrs. Quiggle, and her 100 shares of stock were transferred, and a new certificate therefor issued to Joseph N. Peirsol, cashier of the bank.

Persch, when he received the stock from Hepburn, believed that it belonged to Hepburn, and the bank, in taking it from Persch, and when it was transferred to Peirsol, believed that it belonged to Persch; both gave value and acted in good faith, and neither of them knew that Mrs. Quiggle was a married woman; and the canal company, though knowing that she was a married woman, made the transfer in the ordinary mode of transacting business in their office, and without knowledge of any fraud, deceit or bad faith on the part of any one in procuring or using the power of attorney executed by her.

In October 1863, and after the maturity of the two promissory

[Persch *v.* Quiggle.]

notes of $1500 and $1000 given by Mr. Quiggle to Persch & Steeb, Quiggle tendered to the firm the amount of the notes, and demanded the return of the stock belonging to Mrs. Quiggle, but they declined to accept the money and return the stock.

About October 21st 1863, Quiggle, by his agent the Rev. Dr. Goddard, made a similar tender and demand; Steeb said, " that it was impossible for him to return the stock, as it was not in his possession;" and Persch said " he could not give it up because he held it in accordance with a private transaction between Hepburn and himself as collateral security for Hepburn's private obligations."

About November 1st 1863, Mr. Quiggle by his counsel tendered to the firm the sum of $2800, being the amount of his two notes and his due-bill for $300 held by the firm, and again demanded the return of the stock, whereupon Steeb (in the absence of Persch) replied, that they had not the said stock, nor was it in their possession when the receipt of May 13th 1863, above mentioned, had been given; that Hepburn had in some way given it to Persch, who pledged it to the Consolidation Bank, and the bank claimed to hold it for an individual debt alleged to be due by Persch.

In November 1863, Persch & Steeb became insolvent.

On November 4th 1863, Quiggle and Hepburn joined in a written notice and request to the president and secretary of the canal company, not to pay dividends on or permit any further transfer of the stock which was held in their names or the name of Mrs. Quiggle, as it still belonged to them, and had been illegally and fraudulently transferred to some persons to them unknown; and promising to indemnify the company for their refusal.

This was the first notice received by the company of any objection to the transfer of the said stock to the bank, and in pursuance thereof the company refused to pay dividends to the bank, and make any further transfer of the said stock.

On November 9th 1863, the plaintiffs (not then knowing that the said stock had been pledged to the bank, prior to the loan by Persch & Steeb to Mr. Quiggle on May 13th 1863) filed a bill for an injunction in the Court of Common Pleas for the city and county of Philadelphia, to December Term, No. 4, against Persch & Steeb, the Consolidation Bank and the Tradesmen's Bank, wherein Quiggle under oath declared, among other things, that he gave to Persch & Steeb in May 1863, as collateral security, 100 shares of the stock to be held for the payment of $2500, borrowed by him from them; and the plaintiffs further declare that the stock in that bill referred to was the property of Mrs. Quiggle, and that the firm gave a receipt therefor in all respects similar to the receipt set forth in their present bill dated May 13th 1863, and above mentioned.

[Persch *v.* Quiggle.]

On January 11th 1864, the bill was dismissed at the instance of the plaintiffs, and without prejudice to their future rights.

On January 22d 1864 the present bill was filed; but the writ was not served on Hepburn until December 8th following.

In March 1864, when the Consolidation Bank held from Persch the 100 shares of stock and 153 other shares of the stock of the same canal company, Hepburn, in a letter to the president of the canal company, stated that he had proposed to James V. Watson, president of the bank, to pay the bank the sum of $24,000, as the amount loaned on the stock and take the same; but Mr. Watson declined to deliver the stock, except on payment of an additional sum of $19,500 alleged to be owing by Persch, for which the bank claimed to hold the stock as security.

No portion of the $24,000 loan has been paid, and including the amount of that loan it would appear that Persch still owes the bank the sum of $31,212.95, with interest.

On June 2d 1865 Hepburn and Quiggle entered into an agreement in writing, to settle and close up, as compromised between them, a certain matter involving 200 shares of the stock of the canal company taken by Hepburn as collateral, in which agreement, among other things, it was provided that nothing therein contained should in any way interfere with the rights of Mrs. Quiggle in any stock in the company.

The highest market price of the stock of the canal company. after the date of the loan of Mrs. Quiggle's stock by Hepburn to Persch was $134.50 per share, sometime between February and June 1864.

The master, Samuel Robb, Esq., found the foregoing facts; and after discussing the facts and law in an elaborate opinion reported, that if the bill was objectionable as multifarious, the objection should have been taken by demurrer: also that the court had jurisdiction, because it charged fraud in an agent, prayed an account, &c., and that after a defendant had put in answer, it is too late for him to object that the plaintiff has a remedy at law. He further reported, that the bill should be dismissed as to Peirsol, the bank and the canal company. He further reported, that Persch and Hepburn should account to Mrs. Quiggle for the full value of the stock, which was to be estimated at its highest value, viz., $134.50 per share, after the conversion, with bonus and dividends received, or interest. He reported, that the conversion was about June 1st 1864, and that there should be a decree against Persch and Hepburn for the use of Mrs. Quiggle for $13,450, with interest from June 1st 1864.

The plaintiffs excepted to the report, finding in favor of Peirsol, the bank and the canal company. Hepburn and Persch excepted to the findings against them.

. The court at Nisi Prius decreed that the exceptions to the

[Persch *v.* Quiggle.]

report be dismissed, and the report confirmed, and that the defendants, Samuel Hepburn and John P. Persch, pay to the plaintiffs the sum of $13,450 with interest from the 1st day of June 1864, and costs.

Hepburn appealed, and assigned for error, that the master erred in reporting that the court had jurisdiction, and various errors as to his findings on the facts.

*W. L. Hirst* and *Meredith* (with whom was *T. Cuyler*), for Hepburn, appellant.—As to jurisdiction, the action is on a bailment without hire, and there is a remedy at law. No fraud is alleged or proved. The bill is multifarious in lumping various parties under different contracts; there is no concert in any wrong, nor joinder in any contract: Pusey *v.* Wright, 7 Casey 394. The plaintiffs are estopped by their bill in the Common Pleas. Estoppel applies to married women: McCullough *v.* Wilson, 9 Harris 436; Winter & Hartman *v.* Walter, 1 Wright 160; Cord's L. & E. R. Married Women, §§ 246, 332.

The strict rule as to the conclusiveness of a finding, is applied to the finding of auditors in the Orphans' Court: Mengas's Appeal, 7 Harris 222; Mellon's Appeal, 8 Casey 125; Whiteside's Appeal, 11 Harris 116; Chew's Appeal, 9 Wright 230; Landis *v.* Scott, 8 Casey 495; Loomis's Appeal, 10 Harris 319; Mahler's Appeal, 2 Wright 221. They also argued much at large on the facts.

*A. V. Parsons* and *W. A. Porter*, for appellees, Quiggle and wife.—The report of the master as to facts is conclusive, except in case of some plain error: Riddle's Estate, 7 Harris 434; White's Appeal, 12 Casey 134; Bradford's Appeal, 5 Id. 513; Miller's Appeal, 6 Id. 478, 492; Mellon's Appeal, 8 Id. 121.

Hepburn is liable as bailee for using stock intrusted to him to keep, whether with or without pay: Hartop *v.* Hoare, 3 Atk. 44; Wren *v.* Kirton, 11 Ves. 377; Ex parte Townshend, 15 Id. 470; Kinder *v.* Shaw, 2 Mass. 398; Morris *v.* Wallace, 3 Barr 319; Stanley's Appeal, 8 Id. 431; Commonwealth *v.* McAllister, 4 Casey 480; s. c., 6 Id. 536; Urquhart *v.* McIver, 4 Johns. 103. If Mrs. Quiggle agreed that her husband should receive the stock, as a married woman she is not bound: Anonymous, 6 Mod. 230; Anonymous, 12 Id. 609; Caldwell *v.* Walters, 6 Harris 79; Baxter *v.* Smith, 6 Binn. 427; Dorrance *v.* Scott, 3 Whart. 313; Richards *v.* McClellan, 5 Casey 385; Glyde *v.* Keister, 8 Id. 85; Bear *v.* Bear, 9 Id. 525; Glidden *v.* Strupler, 2 P. F. Smith 400. The assessment of the stock was upon the recognised rule: Bank *v.* Reese, 2 Casey 143.

The appellee's counsel also argued on the facts at much length.

[Persch *v.* Quiggle.]

The opinion of the court was delivered, February 27th 1868, by STRONG, J.—Among the facts of this case there are some which are undisputed. They were found by the master to be established facts, and no exception has been taken to this part of his report. Many of them are also admitted in the answer of the appellant. They are these. In the year 1859, Mrs. Quiggle, the wife of James W. Quiggle, was the owner in her own right of one hundred shares of the capital stock of the West Branch and Susquehanna Canal Company. On the 6th of June of that year, Mr. and Mrs. Quiggle being about to go abroad, he left with Samuel Hepburn, the appellant, considerable stock in the said company and other property, and with them the one hundred shares above mentioned belonging to his wife. For all this the appellant gave a receipt, specifying therein, that, of the property left with him, one hundred shares of the stock of the said company stood in the name of and belonged to Mrs. Quiggle, the par value being $10,000. On the same day, or about that time, Mrs. Quiggle, with the knowledge and consent of her husband, attested by his subscribing as a witness, executed and left with the appellant two special powers of attorney, one authorizing him to receive and receipt for all dividends standing in her name on the books of the said canal company, and to appoint substitutes for that purpose; and the other a blank power to sell and transfer stock, having no date, and not mentioning the number of shares or the names of any company, attorney or assignee, but intended by her to be used in disposing of her said stock if her interests or necessities should require it. The stock of the company having been increased in 1860, the appellant exchanged the old certificates for new ones, and gave to the complainants another receipt acknowledging that he had received six hundred and fifty-three shares in lieu of three hundred at first left with him by Mr. Quiggle, and the one hundred shares left with him belonging to Mrs. Quiggle. For some years he continued to act as the general agent of both Mr. and Mrs. Quiggle. He collected, by himself or his substitutes, the semi-annual dividends on her stock until January 1862, inclusive. Thus far the facts are undisputed. The master further finds that about the 19th of February 1862, the appellant, without the knowledge of the plaintiffs, loaned the one hundred shares belonging to Mrs. Quiggle, together with three hundred other shares of stock in the said company, to John P. Persch, who executed to him a judgment-bond for $60,000 as security for the prompt return of the stock loaned, and for the safe return, when requested, of any other certificates the appellant might lend him. The answer admits the loan, but avers that it was some time in the fall of 1862 (the appellant being unable to state the precise time), and that Persch gave a receipt for the stock, and promised to place it, at the expiration of a few days, in the safe of the firm

7 P. F. SMITH—17

[Persch *v.* Quiggle.]

of Persch & Steeb, there to be kept until called for by the appellant. The receipt is not in evidence. John P. Persch having borrowed the stock, pledged it as a general collateral to the Consolidation Bank, for money to be loaned him by the bank. The blank power of attorney executed by Mrs. Quiggle, was then, or afterwards, filled up, by inserting the name of the canal company, the number of shares, and the name of Joseph N. Peirsol, cashier of the bank, as the attorney, and the bank made loans on the security of the pledge and other property to an amount exceeding $30,000. The complainants allege that thus the stock of Mrs. Quiggle has been lost to her, and this bill seeks to compel an account. The bill has been filed against Hepburn, Persch & Steeb; Joseph N. Peirsol; the Consolidation bank, and the canal company. There are other facts besides those we have mentioned, some not controverted, and some disputed. We shall refer to them hereafter. What we have stated are all that are needed to bring us to the consideration of two objections urged against the bill, *in limine.*

It is insisted the bill is bad for multifariousness. This is not apparent. It seeks an account for the complainant's stock and its product from Hepburn, and from those who have received it mediately or immediately from him. It does not join distinct and independent matters. But if the objection were well founded, and would have been fatal, had it been urged in time, it is too late to urge it now, after answer to the bill, and at the hearing. The defendants should have demurred. It is too late to object to a suit, because of multifariousness, at the hearing: Daniel's Cha. Prac. 396; Ward *v.* Cooke, 5 Mad. 122; Oliver *v.* Piatt, 3 Howard 333, 412.

Again, it is objected that a court of equity has no jurisdiction. That might be so, if the delivery of the stock to Hepburn had been a simple case of bailment for custody. But it was much more. He was the general agent for Mrs. Quiggle, not only for its custody, but for its management. He acted as such. He surrendered the old certificates and took new ones. He collected some of the dividends and appointed attorneys to collect others. There can be no doubt that an action of account render might have been maintained against him as bailiff. And if so, the Act of Assembly of October 13th 1840, makes it a case for chancery jurisdiction.

These objections being out of the way, it is obvious that we have, on the facts heretofore stated and not denied, a primâ facie liability of the appellant at least, to account. It was his duty to keep the 100 shares of stock until it was demanded, and then return it with its accretions to Mrs. Quiggle. Even if he was only an agent without reward, a bailee without hire, and responsible for no more than the most ordinary care, he had no right to

[Persch *v.* Quiggle.]

use the property for his own purposes. He was not at liberty needlessly to expose it. Lending it, as he did, was not an act done for the use or benefit of the owner. It was treating the stock as if it had been his, a conversion. And it was wantonly exposing it to very great hazard. Lending it was giving to the borrower not merely an opportunity but a privilege to use it, in the manner in which certificates of stock, accompanied by blank powers of attorney, are used. He must have known Persch borrowed it for a purpose. But what purpose could there have been unless it was to sell it, or to do what was done, to pledge it as a security for the borrower's debts? It is to be noted that it was not merely the custody of the certificate, but the stock itself that was lent. The appellant, therefore, authorized the borrower to pledge it, and the consequence has been just what should have been foreseen or apprehended. It has been virtually lost by the owner, and lost through the unfaithful act of the appellant, to whom it was intrusted for entirely different purposes from those for which he used it. His act can be regarded as nothing less than a palpable breach of trust. It is a matter of comparatively little importance whether he received any consideration for the loan. He certainly did not lend the stock on Mrs. Quiggle's account, and whether he made a profit out of the transaction or not, it was equally a wrong upon her. The master has found, however, as a fact, that he did lend the stocks for a profit, not only his own, but Mr. Quiggle's and Mrs. Quiggle's, and that Persch paid him for the use of it. True, in his answer it is denied "that he made any gain or gains in any way by the use of the said 100 shares of stock." The denial, however, is not directly responsive to anything charged in the bill, and it is unsupported by any evidence. It would seem quite improbable that property of so much value was lent, with a knowledge that it might be and probably would be pledged as a security for liabilities of the borrower, with a knowledge also that it might be pledged to any extent (for there was no restriction imposed in this particular, so far as it appears or is asserted), and yet that the lender demanded no compensation for the loans. The hazard was great, and it must be regarded as strange, if it was assumed gratuitously. The matter does not rest, however, in mere probabilities. As already noticed, Hepburn took a judgment from Persch, as a security for the prompt return of 400 shares of stock in the canal company, and as a security for the safe return of any other certificates of stock he might lend to Persch. He gave a receipt for this judgment on the 19th of February 1862. He had then loaned stock of the company to Persch at that time. There is no evidence that he loaned any at other times. But it is proved that more than a year before August 29th 1863, Persch had left Mrs. Quiggle's stock in the Consolidation Bank. It is a fair deduction from

[Persch *v.* Quiggle.]

the evidence, we think, that her stock was a part of the 400 shares, for return of which Persch's bond to Hepburn had been given as a security. If it was not, why was the fact not shown? It was capable of proof. In view of this the testimony of Geo. K. Zeigler is exceedingly significant. In November 1863, Persch became insolvent, and in 1864, when Hepburn complained to the witness that he had lost largely by Persch, and was told in reply that he had been paid for it, that he held a judgment, and had been paid a consideration for the use of the stock, he answered that he had received only a small payment of four, five or six hundred dollars, and a small amount for the use of the stock at another time. Did he exact compensation for lending other stock and not Mrs. Quiggle's? In view of this the master was justified in reporting as a fact that the appellant did lend the complainant's stock at a profit, and that he was paid for the use of it. And it is by no means clear that the answer was intended to be a denial of this fact. It avers that the appellant made no gains whatever in any way by the use of the stock. This is true in one sense, even though he received compensation for lending it, if by such an use he lost the subject of the loan. It is not worth while, however, to spend more time on this branch of the case, for whether he was paid for the loan of the stock or not, the act of lending it was equally a breach of trust, and equally disastrous to the complainant.

It is not to be overlooked that the complainant, Mrs. Quiggle, was a married woman. There was, therefore, every reason why her agent who held the custody and had the management of her property, should have observed the strictest good faith towards her. She had returned from Europe in 1861, and she was on hand when her stock was loaned to Persch. Yet she was not consulted. Hepburn undertook to treat it as his own, and exposed it to the extremest hazard, without giving her any notice, certainly without informing her until after the act had been done. Her bill charges that she was kept in ignorance of the matters alleged by her, by the defendants who had used her stock, and that, further to deceive her, the dividends were paid to her or to her order down to July 1863. True, it is averred in the answer of Mr. Hepburn, that he informed her that he had loaned her stock to Persch, that he assured her he considered Persch safe, giving his reasons, in answer to her inquiry, and that she was satisfied with his answers. But when did he inform her? The answer does not state. Not certainly until after the loan had been made, not until after the mischief was done, for he told her he *had* loaned. Her satisfaction with his answer to her inquiries respecting the safety of Persch, is not to be regarded as an approval of the loan. But in fact there is no evidence whatever to sustain this part of the answer. A trustee dealing with the property

of a *cestui que trust*, or an agent dealing with that of his principal, cannot divert it to purposes foreign to the trust or agency without the utmost openness and frankness with the party beneficially interested. And it is incumbent upon him to show that he was frank and open, that he made full disclosures: Story on Agency 239, 260. When Hepburn lent the stock to Persch, without Mrs. Quiggle's knowledge, he made himself responsible to her for the safety of the loan. From this responsibility he was not released by her subsequent satisfaction with his assurances that he considered the loan safe. If this part of his answer then were sustained by the evidence, it would not affect the question whether he is liable to account.

We come then to the real matters of defence. Having shown that the relation which Hepburn sustained to Mrs. Quiggle entitled her to call him to account for the stock left with him, and having shown that his breach of trust primâ facie renders him responsible for its consequences, the next inquiry is whether he has shown either that he has accounted, or that he has been discharged. That he has accounted is not claimed. But it is strenuously insisted that he has been discharged. The master has found as a fact that in the spring of 1863, when the stock, together with other securities, stood pledged to the Consolidation Bank for over thirty thousand dollars, loans and discounts to Persch, Mrs. Quiggle, under the belief that her stock was in the fire-proof of Persch & Steeb (a firm of which John P. Persch was a member), and deposited there as a place of safe keeping, and in ignorance of the pledge to the bank, consented that her husband might lift the stock. Accordingly, on the 13th of May 1863, Hepburn and the husband went to the office of Persch & Steeb; Persch and Hepburn first arranged some undisclosed private matters, and then Persch, within earshot of Hepburn, requested Steeb to give a receipt in the name of the firm for 100 shares of the stock of the canal company, which he said he had at the Consolidation Bank; that it belonged to Hepburn formerly, but that he had returned it to Mr. Quiggle, who wanted to borrow some of it. Steeb objected that the firm ought to have the stock in their safe keeping; to which Persch replied, that he could get it whenever he wanted it, that it was as safe in the bank as it would be in the office. Whereupon Steeb, for the firm, gave to Quiggle a receipt for 100 shares in the name of Mrs. Quiggle, held as collateral for the payment of his two promissory notes to the firm for money lent to him, one for $1000 and the other for $1500. But the firm of Persch & Steeb never had possession of the stock. It had been lent by Hepburn to Persch, and it was pledged by him on his individual account to the bank. Was this a discharge of Hepburn's liability? Was it a return of the stock to Mrs. Quiggle, or equivalent thereto? We are constrained to

say that it was not. Assuming that the facts are as thus found by the master, Mrs. Quiggle was not, on the 13th of May 1863, in such a situation as to make any discharge given by her to her agent binding upon her. That agent certainly can derive no advantage from anything that she did in ignorance of what it was his duty to communicate to her. And it is incumbent upon him to show that in any agreement made with her, which released him, she knew the actual condition of her property. She had confided in him, and it was his duty to be faithful to her and to inform her of everything that related to the interests intrusted to his care. But she was not informed that her stock, instead of being in his hands, where it ought to have been, was then in the Consolidation Bank, pledged, if it was then pledged, to secure a debt due by Persch. It is said Hepburn himself did not know that fact. Let it be so. He ought to have known it. He had lent it to Persch months before, according to his own statement, Persch promising at the expiration of a few days to place it in the fire-proof of Persch & Steeb. The loan having been unauthorized and a breach of trust, there was double reason for his seeing that the promise had been complied with. Duty to his *cestui que trust* required it. And she had a right to all the information which he had, or which it was his duty to have. But did not Mr. Hepburn know that the stock was not in the safe of Persch & Steeb, where his answer avers both Mr. and Mrs. Quiggle supposed it was? The answer states that early in the year 1863 he called upon Persch and asked him to return to him the stock; to which Persch replied, that he had not then the said stock in his safe, but would·have it by the following Saturday; that Hepburn insisted he should "lift" the shares of stock and return them to him that he might deliver them to Mrs. Quiggle, and that Persch then promised to return them when he (Hepburn) should next be in Philadelphia. It is further averred in his answer, that he returned to Philadelphia in the month of March, or early in April 1863, as he believes; that he called again upon Persch and demanded a return of the stock; that Persch replied that he and Mr. Quiggle would arrange for it; that Hepburn then said that would not do, that the stock must be given to him, and that Persch again put him off. In the light of this, it is difficult to believe that Hepburn did not know that the stock was not in the safe of Persch & Steeb, and that he had not reason to suspect, at least, if he did not know, it was pledged. There is some significance perhaps in the language of his answer, when he avers that he insisted that Persch should "lift the said shares of stock" and return them. He knew at least that there was difficulty in getting it out of the hands of Persch, for he had tried repeatedly in vain. But of all this, so far as the evidence shows, Mrs. Quiggle was ignorant when she assented to her husband's taking

it, and thus relieving Hepburn from responsibility for it.  The master has found that she acted under the belief that the stock was free and untrammelled in the fire-proof of Perch & Steeb as a place of safe keeping.  She was not then in a condition to make any arrangement by which her rights to the stock as against Hepburn should be discharged; and he cannot avail himself of any acquittance given by her in ignorance of facts which it was his duty to communicate.  He could not deal with her as he might have dealt with a stranger.  The confidential relation forbade it.  Can it be supposed that she would have consented to let go her hold upon her trustee had she known that the stock was not in the safe of Persch & Steeb, but that it had been lent to Persch, and that Hepburn, after repeated efforts, had failed to get it back?  It is incredible.

But to what did she agree?  She agreed that her husband might become the custodian of the stock in the place of Hepburn.  Had he obtained it, in pursuance of the agreement, Hepburn might have been discharged.  But she did not agree that her husband might receive somebody's promise to deliver it.  A mere chose in action, instead of the thing itself.  Much less did she agree to receive the stock, encumbered by a pledge for the debts of Persch.  Nor did she agree that the receipt of Persch & Steeb should be substituted for Hepburn's responsibility to her.  And her husband never received the stock.  Without charging fraud in the arrangement made in Persch & Steeb's office, it is certain that the custody and control was not given to the husband, which it was Hepburn's duty to give, or cause to be given, not such as Mrs. Quiggle consented should be given.  There was then no discharge.

It matters not that after the 13th of May 1863, when Mr. Quiggle took the receipt from Persch & Steeb, Hepburn had no control of the stock.  That was a consequence of his own act, not of anything to which Mrs. Quiggle agreed.

Numerous exceptions have been taken to the report of the master.  What we have said disposes of most of them, or shows that they are unimportant.  If the loss of the stock was occasioned by Hepburn's breach of trust, in lending it, as it was, it is a matter of little importance whether he knew that Persch had pledged it.  But, as we have incidentally remarked, the purpose of lending it must have been that it might be pledged, and the proof is that Hepburn did know it was in the Consolidation Bank.  Why there if not pledged?  Besides, the difficulty he had in getting it back from Persch in the early part of 1863, must have been most suggestive.  That it was in fact held by the bank as a collateral for Persch's debt, sometime in 1862, is proved by James Watson.  It was left at the bank as a general collateral, and Persch's account shows that there never was a time

[Persch *v.* Quiggle.]

after it was left, when he was not indebted to the bank. But it is unnecessary to go over the exceptions in detail. The facts which are undisputed or abundantly proved, justify the conclusion at which the master arrived, and there is nothing in any exception that could produce a different result.

We put the case, not upon fraud, but upon a breach of trust, in lending the stock to Persch, the consequence of which was that the complainant has totally lost it. This renders the appellant liable to account for its value, and he has shown nothing that either in law or equity discharged him from that liability.

The rule by which the account has been stated, is the one laid down in Bank *v.* Reese, 2 Casey 143, and it is correct.

The decree made at Nisi Prius is affirmed, with costs.

Subsequently, March 5th 1868, the plaintiffs filed a bill of costs, amounting to $1138.47, which the prothonotary reduced to $935.40. In reporting upon the taxation the prothonotary said: "The prothonotary is of opinion that he cannot apportion the costs, and that under the ruling of the court in this case, the respondent, Hepburn, is liable for all the costs which the party complainants have a lawful right to charge."

The prothonotary accordingly taxed the costs against Hepburn and Persch. His report, on exceptions, was confirmed by Judge Strong, except one item in the *amount*.

From this taxation Hepburn appealed to the Supreme Court, and assigned for error: that "the court below erred in confirming the taxation of costs, imposing the whole instead of a proportion of the costs upon the appellant Hepburn."

*W. L. Hirst*, for appellant, cited 1 Tr. & H. Pr. 727; 3 Daniel's Ch. Pr. 40; Prevost *v.* Bennett, 2 Price 272.

*A. V. Parsons*, for appellees.—Gibson *v.* Cummings, 1 Casey 231; Brightly's Eq., §§ 782, 783, p. 554; Ramsey's Appeal, 2 Watts 230; Coates's Appeal, 7 W. & S. 99; 3 Danl. Ch. Pr. 22.

The opinion of the court was delivered, February 8th 1869, by

AGNEW, J.—A statement of this case shows that the appellants have mistaken their remedy in this so-called appeal. The bill exhibited at Nisi Prius was against six defendants. After the filing of the master's report the Court of Nisi Prius confirmed it, and decreed that Hepburn and Persch pay to the plaintiffs $13,450, with interest and *costs*, and dismissed the bill as to the other defendants. This disposed of the whole case in the court below. The decree carried all the costs that the plaintiffs had incurred in the prosecution of their bill. This may have been an error; and these two defendants ought not to have paid all the

[Persch *v.* Quiggle.]

plaintiffs' costs, but a proportion only. But if an error, how was it to be corrected? Clearly by an appeal from the Nisi Prius to the Supreme Court. Now this is precisely what these two defendants did; and they assigned twelve errors to the decree of the Nisi Prius, not one of which touched the costs. Now, if a part of the master's fees, or other expenses incurred in prosecuting the bill, ought to have been paid by the plaintiffs and not by the defendants, that was a substantial error to be assigned and corrected in this court, or else it was waived.

By the decree of this court, the decree of the judge at Nisi Prius was affirmed at the costs of the appellants. Thus the case went back with a final decree in favor of the plaintiffs for *all* their costs. Then came the *taxation* of the costs under this decree, from which the defendants appealed to the judge at Nisi Prius, who affirmed it with one exception. What was that taxation? Simply the ascertainment of the items to be paid under and according to the decree. It was no part of the business of taxation to readjudicate the right of the plaintiffs to recover all their costs from the defendants—that was already settled by the final decree of this court; but its proper purpose was to ascertain *what sums* the plaintiffs had expended, or were liable for, as costs. On that question the decision of the prothonotary, affirmed by the judge at Nisi Prius, was conclusive, unless reviewed by an order of this court; and then it would extend only to the question of *taxation*. But the defendants, without asking for a review, appealed from the order of taxation to this court. No authority has been shown to authorize such an appeal; and if the appeal could be sustained, it brought up only the question of taxation. But the question raised upon this appeal is not one of taxation. It is, whether the defendants are liable for only a proportion, and not all of the taxable costs? Now what is this, but to ask us to decide the very question we ought to have been called on to determine in the first appeal? They had been decreed at Nisi Prius to pay all the plaintiffs' taxable costs, which, if an error, ought then to have been corrected. It would have been sufficient to have referred to Gibson *v.* Cummings, 1 Casey 231, as decisive of this case; but the strenuous effort to induce us to decide a second time what was really decided before, has caused us to endeavor to state the matter plainly by referring to the exact state of the case. The omission to assign for error the portion of the decree at Nisi Prius relating to costs, cannot be remedied by a second appeal.

Appeal quashed at the costs of the appellants.

SHARSWOOD, J., dissented.