## Conyngham's Appeal.

1. When a pledge is collateral security for all claims, &c., which the pledgee held or might hold against the pledgor, consisting of a number of items, money loaned, notes, &c., it comes within the jurisdiction of equity under the head of account.

2. Without an account the pledgor could not know the amount to tender, which is an indispensable condition to his right to maintain an action at law.

3. The holder of a collateral security cannot appropriate it in satisfaction of the debt at his own option, unless authorized to do so, by the terms of the bailment.

4. The holder of a collateral security cannot sell it without first giving notice to the pledgor that he may have an opportunity to redeem it.

5. The sale of a collateral security must be public, and there must be notice of the time and place of sale.

6. When a power of attorney to transfer is delivered to the pledgee with stock pledged, want of notice of the sale to the pledgor would not affect bonâ fide purchasers for a valuable consideration.

7. After an unauthorized sale by a pledgee of a collateral security, he is chargeable with what would have been received had he retained it, until the equity of redemption had been foreclosed by notice according to law.

8. Stock pledged and improperly sold by the pledgee, must be accounted for at the highest price it attained in the market at any time afterwards.

9. When officers of a bank become borrowers from it,—which they should not be,—their transactions for their own benefit should be closely scrutinized, but the same principles of law are to be applied to them as to others.

March 20th 1868. Before STRONG, AGNEW and SHARSWOOD, JJ. THOMPSON, C. J., at Nisi Prius. READ, J., absent.

Appeal from the Court of Common Pleas of *Northampton county*: In Equity: Of January Term 1868.

The proceeding in this case was a bill in equity by Peter S. Michler against The Farmers' and Mechanics' Bank of Easton, filed February 11th 1865. The plaintiff died after the answer had been filed and an examiner appointed, and on the 12th of November 1866, Thomas D. Conyngham, his administrator, was substituted.

The bill averred the following facts:—On the 16th of January 1861, Michler was considerably indebted to the bank on his own account and was liable as endorser for others. On that day he

deposited with the bank, certificates for 60 shares of the stock of the Thomas Iron Company and 49 shares of the stock of the bank itself, " as collateral security for the payment of all claims, liabilities and demands" which the bank then held or thereafter might hold against him, and gave the bank powers of attorney to transfer the shares. On the next day he delivered to the bank the following paper:

" This is to certify, that the undersigned has deposited with the cashier of The Farmers' and Mechanics' Bank of Easton, certificates for 60 shares of the stock of the Thomas Iron Company, and 49 shares of the stock of the Farmers' and Mechanics' Bank of Easton, as collateral security for the payment of all claims, liabilities and demands of any nature whatsoever, that said bank may now or hereafter have against the undersigned, for notes drawn or endorsed by him, or for any other claims, demands, or liabilities, that said bank may now or hereafter have against the undersigned, and further that two letters of attorney of date January 1st 1861, have been duly executed by the undersigned, for the transfer of said stock upon the books of the respective companies for the purposes aforesaid. In witness whereof I have hereunto set my hand and seal, the second day of January, A. D. 1861.

"P. S. MICHLER, [SEAL.]"

The bank, on the 23d of October 1861, transferred the Iron Company stock to their president for their own use; this stock was increased by a stock dividend of 9 shares on January 20th 1862; by another of $6\frac{1}{4}$ shares August 5th 1862. On the 26th of January 1863, the bank, without the knowledge of Michler or notice to him to redeem, sold and transferred the Iron Company stock to Derrick Hulick. On the 1st of May 1864, there was another stock dividend made by the company, increasing the whole number to $100\frac{1}{4}$ shares. Michler was ignorant what had been done with the shares of the bank stock. After the transfer of the stocks had been made, cash dividends had been paid on both, amounting to $2328.31. On the 4th of November 1864, Michler was indebted to the bank in the sum of $13,525.78, which he on that day tendered to the bank in payment of his indebtedness, and demanded a surrender of his notes and obligations and of the shares of stock with its increase and an account and payment of the cash dividends. At that day the Iron Company stock was worth $10,526.25, and bank stock $3430.

The bill prayed relief as follows: " That an account be taken between the parties as of November 4th 1864, and up to the time of the final decree in the case; that defendant be charged with the full value of the $100\frac{1}{4}$ shares of Thomas Iron Company stock and of the 49 shares of bank stock as they were on November 4th 1864, also with all the cash dividends declared on all the shares

[Conyngham's Appeal.]

aforesaid up to the final decree, and that defendant be ordered to pay to plaintiff whatever balance should be found due upon such account; that defendant be restrained from proceeding with any actions at law on any of the notes held by them:" and general relief.

Fourteen interrogatories as to the matters charged in the bill were appended.

The bank demurred to the bill: 1. That the matters in the bill could be tried at law; 2. That the bill does not show such a case as entitles the plaintiff to the discovery or relief prayed for, and that it does not show any equity.

They filed an answer, with the demurrer, containing these averments. Michler had been president of the bank since its organization until July 1st 1861; he was interested in many business enterprises himself and aided others, his relatives, in their business. In consequence he asked from the bank more discounts than the directors considered safe with the endorsements they then had: on the 1st of January 1861, Michler being liable to the bank for $19,168.41, the directors asked him for further security; and he deposited with the bank, as additional security, the certificates of stock and powers of attorney mentioned. The bank considered that the powers of attorney gave them full control over the stock when it became necessary to use it for their protection, and the directors understood that such control had been verbally given to them by Michler. The affairs of Michler, and those of his relatives with whom he was connected in business, and who with him were liable to the bank, became much embarrassed in January 1861, executions were issued against them, and Michler's creditors threatened to attach his stocks: to protect themselves; they transferred the stocks, and made the transfer publicly known, and they believe Michler knew it.

The Iron Company stock increased by stock dividends till it reached $75\frac{1}{4}$ shares; it was sold on the 26th of January 1863, without privacy or secrecy, to Derrick Hulick for $70 per share, which was the highest price at which it was selling; the sale was not kept from the knowledge of Michler, who never made inquiry about it, having removed to Philadelphia in 1861; but no special notice was given him of the sale. The bank stock was, on the 23d of October 1861, taken by the bank, and in 1862, sold and transferred to other parties for $50 per share, which was the highest price for which it was selling. The bank is not required to answer as to dividends and accretions since October 1st 1861. The large expenditures of the Government and the suspension of specie payments, made a great nominal increase in the value of stocks, which is not to be considered the true value. There were a number of cash dividends declared upon the stock up to 1862 (which are stated in the answer), some of which, that were speci-

[Conyngham's Appeal.]

fied, had been paid to the purchasers of the stock.   On the 23d of April 1862, Michler was credited with a dividend of $73.50 on the bank stock, with 60 shares of the Iron Company stock at $50 per share, 49 shares of bank stock at $45 per share, which left him indebted to the bank $208.72 on his overdrawn account, besides his indebtedness on notes, &c., which the answer specifies, amounting to $6100, besides costs and interest.   The tender and refusal as stated in the bill were admitted.   The bank did not know the value of the stocks on the 4th of November 1864, and are not bound to ascertain.

Exceptions were filed to the answer.

The court overruled the demurrer, and required the bank to make further answer.

The bank further answered as follows : They could not state whether the Iron Company stock was or not sold to Hulick without the knowledge or consent of Michler further than had been stated in their answer ; they believed that the defendant gave them full authority to sell and transfer the stock as they should desire; Michler verbally agreed that the bank might use the stocks as they might desire to protect themselves ; they gave Michler no special notice of the sale, nor asked his consent, nor did they give him notice to redeem, not being required to do so.   The stocks were not exposed to sale at public auction, nor were there any written or printed notices of the sale.   They " gave out word as to their desire to sell the stock to the best advantage and made inquiry to ascertain who desired to purchase such stock, thus offering it to public competition, and sold the same for the best price they could procure, obtaining from the said Derrick Hulick a higher price than stock of said company had theretofore brought as far as they could ascertain."

An examiner was appointed, and a large amount of evidence taken as to the transactions of the directors with regard to the stocks and as to the value of the stocks.

The court below, without delivering an opinion, made this decree : " The bill is dismissed on the merits at the cost of the plaintiff."

Conyngham appealed, and assigned for error the decree and that the court had not decreed an account between the parties.

*H. Green*, for appellant.—The case involves mutual accounts, discovery and a matter of trust.   Chancery has therefore jurisdiction : 1 Story's Eq. §§ 67–74, 442–459 ; 3 Bl. Com. 437 ; Post v. Kimberly, 9 Johns. 469 ; Carlisle v. Wilson, 13 Ves. 278 ; Harrison v. Rowan, 4 W. C. C. R. 205 ; Bright. Eq. Juris. §§ 123, 124 ; Koons v. Bute, 2 Phil. 570 ; Gloninger v. Hazard, 6 Wright 401 ; Armstrong v. Gilchrist, 2 Johns. Cas. 424 ; N. Y. Insurance Co. v. Rowlet, 24 Wend. 505 ; Kirkpatrick v.

[Conyngham's Appeal.]

McDonald, 1 Jones 392; Edwards on Bailment 212, 213; 2 Story's Eq. § 1032; Jones *v.* Smith, 2 Ves. Jr. 372; Kemp *v.* Westbrook, 1 Ves. Sr. 278; Tucker *v.* Wilson, 1 P. Wms. 261; Demainbray *v.* Metcalf, 2 Vern. 691; Vanderzee *v.* Willis, 3 Bro. Ch. R. 21; Hart *v.* Ten Eyck, 2 Johns. Ch. 117; Diller *v.* Brubaker, 2 P. F. Smith 498; Wesley Ch. *v.* Moore, 10 Barr 274; King *v.* Baldwin, 17 Johns. 388.

The averments in the answer as to the verbal authority, if to be treated as positive allegations, are not evidence, because they are new allegations: Bright. Eq. 519, § 721; Eberly *v.* Groff, 9 Harris 256; Pusey *v.* Wright, 7 Casey 387.

After the transfer, the bank held the stock in trust, as they had done before: Wilson *v.* Little, 2 Comst. 443; Allen *v.* Dykers, 3 Hill 593; Edw. on Bailments 251, 252, 260; Langdon *v.* Buell, 9 Wend. 80; Cortelyou *v.* Lansing, 2 Caine's Cas. 200; Middlesex Bank *v.* Minot, 4 Metc. 325; Denny *v.* Lyon, 2 Wright 98; Act of May 21st 1861, § 1, Pamph. L. 771.

Michler should have had notice to redeem: 2 Kent Com. 582, 583; Garlick *v.* James, 12 Johns. 146; Sitgreaves *v.* Bank, 13 Wright 363; De Lisle *v.* Priestman, 1 P. A. Browne 176; Davis *v.* Funk, 3 Wright 243; Diller *v.* Brubaker, 2 P. F. Smith 498; Wheeler *v.* Newbold, 16 N. Y. Rep. 392 (2 Sm.); Rankin *v.* McCullough, 12 Barb. 103; Dykers *v.* Allen, 7 Hill 497; Costello *v.* City Bank, 1 N. Y. Leg. Obs. 25; Edw. on Bailm. 248, 259; 2 Story's Eq. §§ 1008, 1033; Lewis *v.* Graham, 5 Am. L. Reg. 368; Stearns *v.* Marsh, 4 Denio 227.

As to the rule by which the bank must account: Edw. on Bailm. 259, 260; Shepherd *v.* Johnson, 2 East 211; Vaughan *v.* Wood, 1 My. & K. 403; Montgomery Bank *v.* Reese, 2 Casey 143; Musgrave *v.* Beckendorf, 3 P. F. Smith 310; Hart *v.* Ten Eyck, Davis *v.* Funk, Diller *v.* Brubaker, *supra.*

*H. D. Maxwell* and *W. H. Armstrong* (of Easton), for appellees.—A defendant may at any stage of a cause take advantage of the want of equity in the bill on the ground that the plaintiff has a remedy at law: Baker *v.* Biddle, 1 Bald. 416; 1 Smith's Ch. Pr. 201; 1 Harrison Ch. Pr. 282; Willes Eq. Pl. 434, 443; Brightly's Eq. §§ 459, 460, 609; Skilton *v.* Webster, Brightly R. 233; Patterson *v.* Lane, 11 Casey 275; Updegraff *v.* Crans, 11 Wright 103; Thomas *v.* Patrick, 4 Watts 414; Strasburg Railroad *v.* Echternacht, 9 Harris 220; Sitgreaves *v.* Farmers' & Mechanics' Bank, 13 Wright 359; 2 Story's Eq., §§ 794, 798; Wiswardle *v.* McGowen, 2 Barb. 270; Stevens *v.* March, 4 Denio 227; McLean *v.* Walker, 10 Johns. 472; Bath *v.* Collins, 13 Wend. 139; Shepherd *v.* Johnson, 2 East 210; Rankin *v.* McCullough, 2 Barb. 103; Dyken *v.* Allen, 7 Hill 497; 2 Comstock on

[Conyngham's Appeal.]

Actions at Law, *Case;* Davis *v.* Funk, 3 Wright 243; Biddle *v.* Bayard, 1 Harris 150; Ramsey *v.* Westmoreland Bank, 2 Penna. R. 203; Bank of Montgomery *v.* Reese, 2 Casey 143; 2 Story's Eq., §§ 1263, 1495.

The answer is responsive: 2 Daniels' Ch. Pr. 840; Brightly's Eq. Jur. § 720; Pusey *v.* Wright, 7 Casey 387.

Michler's position in the bank dispensed with notice: West Branch Bank *v.* Fulmer, 3 Barr 399; Harrisburg Bank *v.* Forster, 8 Watts 12; Edw. on Bailm. 248, 255; Story's Eq., § 1264; 2 Fonblanque Eq., b. 2, ch. 5, § 5, note (6); Brown *v.* Smith, 2 Ch. Cas. 124; s. c. 1 Ver. 84; Com. Dig. *Chancery;* 4 Watts 25; Davis *v.* Funk, 3 Wright 250.

As to the measure of damages in this proceeding: 2 Parsons on Cont. 140, 141; 1 Am. Lead. Cas. 276, 294; Iredell's Eq. 42.

The opinion of the court was delivered, March 27th 1868, by

SHARSWOOD, J.—The demurrer to the bill was properly overruled by the court below. It may be that in the case of a simple pledge of merchandise, stock or securities for an existing debt, or an advance made upon them at the time, the remedy of the pledgor at law is full, complete and adequate: 2 Story's Eq., § 1032. But when the pledge is, as in this case, collateral security for the payment of all claims, liabilities and demands, which the pledgee then held or might thereafter hold against the pledgor, and these claims and liabilities are alleged to consist of a large number of items of moneys loaned, notes discounted on the endorsements of others for his accommodation, and endorsements by him for the accommodation of others, it is evident that the case comes within the jurisdiction of a court of equity under the head of account. Besides that, we have here the additional circumstance that the stock pledged became in the hands of the pledgee entitled not only to dividends in money, but to accretions by the distribution of new stock in the shape of stock dividends. Judge Story has accurately stated the received doctrine on this subject: 1 Eq. Jur., § 506: "Liens also give rise to matters of account. . . . . . As no suit is maintainable at law for the property of the owner, until the lien is discharged, and as the nature and amount of the lien often are involved in great uncertainty, a resort to a court of equity to ascertain and adjust the account seems, in many cases, absolutely indispensable for the purposes of justice. . . Cases of pledges present a similar illustration, whenever they involve indefinite and unascertained charges and accounts." It is clear that without an account, as well of the items of charge as of the dividends received in money and stock, the pledgor could not know what amount to tender, and this is an indispensable condition to his right to maintain any action at law. There are many precedents in the equity reports of bills to re-

deem the pledge and for an account under similar circumstances: Tucker *v*. Wilson, 1 P. Wms. 261; Demambray *v*. Metcalf, 2 Vern. 691, 698; Kemp *v*. Westbrook, 1 Ves. Sr. 278; Vanderzce *v*. Willis, 3 Brown's Ch. Rep. 21; Jones *v*. Smith, 2 Ves. Jr. 372; Hart *v*. Ten Eyck, 2 Johns. Ch. R. 100; Diller *v*. Brubaker, 2 P. F. Smith 498. In none of these cases indeed was the question of jurisdiction raised, but it was assumed both by bench and bar as incontrovertible.

But we are of opinion that upon the answer and proofs the complainant below is entitled to a decree for an account, and that the court was in error in dismissing the bill upon the merits. It is to be remarked that no opinion was given, nor was the case referred to a master. The consequence is that the full examination of the pleadings and proofs has been devolved upon us, just as if it had been a case of original jurisdiction. We must be allowed to · express our decided disapprobation of such a course. On what ground the decree below was made we are left to conjecture as we best can. We need not, indeed, in this case, go beyond the answer itself to justify the result at which we have arrived. It admits distinctly that as additional security, the complainant did deposit with the defendants certificates for sixty shares of the Thomas Iron Company, and forty-nine shares of the capital stock of the corporation defendants themselves, and at the same time delivered to them the necessary powers of attorney authorizing the transfer and sale of the said shares, and executed and delivered to them a declaration, a copy of which is annexed to the answer, that such deposit was intended " as collateral security for all claims, liabilities and demands of any nature whatsoever, that said bank (the defendants) may now or hereafter have against the undersigned (the complainant) for notes drawn or endorsed by him, or for any other claims, demands or liabilities that said bank may now or hereafter have against the undersigned." It is true that they set up that by these powers the complainant gave to defendants full control and authority over the stocks pledged, whenever it should become necessary to use them to protect themselves from loss, and they admit that, it having so become necessary, they were subsequently sold without notice to the complainant. But this is a matter of law in which they are clearly wrong. It is sufficient to cite the case of Diller *v*. Brubaker, 2 P. F. Smith, in which it was ruled by this court that a holder of collateral security cannot appropriate it in satisfaction of the debt at his own option, unless especially authorized to do so by the terms of the bailment. Nor can he sell it without first giving notice to the pledgor of his intention to do so, in order that he may have an opportunity to redeem it if he desires. The sale must be public when it is made, and the notice must specify both time and place. " That this is the law of this species of

[Conyngham's Appeal.]

bailment," says the present Chief Justice, in that case, "admits of no doubt." Even the amended answer does not distinctly aver that the complainant had given any express authority to sell without notice, but even if it can be strained so to mean, as it was not responsive in this respect to the bill, it should have been supported by proofs, of which none were given that we can discover. The understanding of the directors that the bank had entire control of the collateral amounts to nothing. No proposition can be plainer than that the powers of attorney to transfer the stock implied no such agreement. They were necessary to authorize an assignment on the books of the respective corporations, and thus give a perfect legal title to the purchasers. As to such purchasers, bonâ fide and for valuable consideration, the want of notice of the sale to the complainant would not affect them. But as between the pledgor and the pledgee, the question is entirely different. Had the defendants given due notice, as they were bound to do according to law, these powers of attorney were still necessary to enable them to transfer the legal title to the stocks. It was essential to their security that they should hold them. Nor did the defendants, when they transferred the stocks to their president, for their own use, vary thereby their relations to the complainant. They did not become the absolute owners. The equity of redemption was still in him. The stocks were still a mere pledge; their dividends and accretions belonged to the pledgor. After the unauthorized sale of them to third persons, they are also in equity chargeable with what would have been received had they retained them, as they ought to have done, until the equity of redemption in the complainant was foreclosed by a sale after notice in the manner prescribed by law. It follows that they must account to the plaintiff and appellant for the value of the stock at the highest rate which it has at any time since attained in the market: Bank of Montgomery v. Reese, 2 Casey 143.

We are unable to perceive that the official position which the complainant held as president of the corporation defendants, at the time of the pledge, made any difference. Standing in that confidential relation, all his transactions with the bank for his own benefit should be closely scrutinized; but we cannot infer from that relation alone that he gave a special power to sell the pledge without notice. The officers of banks ought never to be borrowers; but when they become so, we can only apply to them the principles of law applicable to others. Though the complainant may have taken advantage of his place and influence improperly to procure loans beyond what his means justified, and thus involved the bank in embarrassment and loss, the responsibility of that rests upon the directors, who, in dealing with their own

7 P. F. SMITH—31

[Conyngham's Appeal.]

officer, ought to have been especially careful to secure the bank from loss.

The decree of the court below dismissing the bill is reversed; and now it is ordered and decreed that defendants do account to the plaintiff of and concerning the matters set forth in the bill, and that it be referred to a master to take and state such account.