# Learock *v.* Paxson, Appellant.

*Bailment—Conversion of stock—Damages—Measure of damages—Brokers.*

In an action against a firm of stockbrokers by one of their customers, to recover damages for the wrongful conversion and sale of the latter's stock, the measure of damages is the highest price for the stock between the date of the conversion and that of the trial.

In such a case where the customer reserves his right to sell the stock pledged in the hands of his brokers upon any occasion that he might desire to do so, and the brokers sell it without notice to the customer, or authority from him, although he was ready and willing to protect it, a tender on the part of the customer is unnecessary before suit brought.

Argued March 21, 1904.   Appeal No. 80, Jan. T., 1903, by defendant, from judgment of C. P. No. 2, Phila. Co., Dec. T., 1899, No. 206, on verdict for plaintiff in case of George F. Learock v. William B. Paxson and Mahlon B. Paxton, trading as Frederick Paxson & Company.   Before DEAN, FELL, BROWN, MESTREZAT and THOMPSON, JJ.   Affirmed.

Trespass to recover damages for alleged conversion of stock. Before SULZBERGER, J.

The facts are stated in the opinion of the Supreme Court.

The court charged in part as follows :

The plaintiff was the manager of a theater, and apparently, from the results, a capable and competent manager, with a certain degree of thrift, as is evidenced by his savings bank books, and a certain degree of success, as shown by the fact that he had at least $7,000 in cash apparently from savings, or other receipts.   His occupation as manager of a theater appears to have allowed him a certain amount of leisure, and this leisure he proposed to employ by going into a kind of merchandising. He began by dealing in the great agricultural staple of the country, wheat, and then he dealt in the shares of a trading company that was concerned with another great staple, tobacco. According to the account presented, his sagacity respecting the production and marketing of wheat seems to have been at fault, and on the whole he was a loser in that matter.   He bought 300 shares, Philadelphia standard, of the stock of the

American Tobacco Company, at an average price of about $60.00 a share, in November, 1899, being a total price of about $18,000. First and last he paid on account of this purchase what was accepted as cash, and therefore is cash, the sum of $6,000, or thereabouts, and thereupon he had to raise $12,000 more, and this he raised—theoretically, of course, but still he raised it—by depositing these 300 shares, which both parties agree existed, with Paxson & Company, who loaned him $12,000 on it. The relations of the parties were therefore these : Paxson & Company, besides being his brokers, had become money lenders and had loaned him $12,000—I suppose at six per cent, since no other rate was mentioned—upon the implied condition, evidenced by their acceptance of the security, that they would hold the collateral as security for the payment of the loan. It is undoubtedly usual in transactions of this kind where dealings are in securities liable to fluctuate rapidly in the market, to make an agreement whereby the lender of so large a sum of money as $12,000, upon such securities, may, when he is in peril of loss, secure himself against actual loss, by a sale of the collateral in the market. In the absence of any special agreement respecting the rights of the pledgee, the man who advances the money on the collateral, however, they stand merely on the ordinary footing of pledgor and pledgee, and that ordinary footing is this : When a man has borrowed money on a pledge of collateral security, with the implied understanding that the collateral security is to be effectually used so as to protect the lender against loss on that loan, the lender must give the borrower reasonable notice of his intention to sell the collateral. [It is conceded in this case that no reasonable or other notice was given to the borrower, and that this collateral was, contrary to the law of pledges, sold without any notice whatever being given to the man who was the borrower of the money and the owner of the collateral. That was, in law, a breach of the contract of the lender, and for that breach he is liable in damages.

There must, therefore, if there be any damage, be a verdict for the plaintiff, and that there is damage is claimed by the plaintiff and conceded by the defendants.

The plaintiff, however, claims that the damages suffered by him exceed the sum of $14,000, whereas the defendants

contend that the whole damage suffered by the plaintiff was $744, less $36.00 which would be $708.

There are certain patent facts which you must not leave out of your minds, namely, that at the time of the sale of this pledged security the whole amount of money that the plaintiff ever put into that security was $5,600, according to the evidence. That is all he had in it. The rest had been put in by the defendants. Now a man cannot conceivably lose more than $5,600 on $5,600. That is all he can lose—that is the whole of it—unless that $5,600 is in a shape that it enhances in value. There is no evidence before us that at the moment when Mr. Learock was notified that his property was sold, the property had at all advanced in value. On the contrary, it had gone down in value over $5,000. I think there is no evidence before us of its having in a short time afterwards enhanced considerably, perhaps for a month—certainly for some weeks.

The point of the case appears to me to be this, and that is what I leave to you : I take it that the calculation of the defendants is not quite correct. According to their statement, the sale at $80.00 produced $224 in favor of the plaintiff, and the sale at $85.00 necessarily produced $750 more. Therefore, there would have been in their hands on the 19th of December, $974, and that, with interest to date, nearly three years, which would make pretty nearly $180, would make the plaintiff's claim about $1,150 to date, roughly calculating it. To that amount, accurately calculated, I take it the plaintiff is entitled anyhow.

There are complications in the case. The first complication is that the defendants sold this collateral without any order and without any legal authority. The second complication is that after the defendants had sold it for $85.00 a share, they sent the plaintiff an account in which they alleged that they had sold it for $80.00 a share. Where a man in a confidential relation like that of a pledgee sells, without notice to the pledgor and in his absence, the pledgor's property; the highest good faith is required. If, therefore, the defendants wilfully made the return at $80.00 then it is for the jury to consider whether this intent to defraud the plaintiff, if it existed, was not older than the making of the account, was not in their minds when they made the sale, and would not be one of the reasons why they had made the sale.

You are therefore to determine whether the defendants had in their minds a fraudulent intent when they made the sale. If you find that they acted merely from error and that they had at that time no fraudulent intent, then the recovery of the plaintiff is limited to the amount I have stated.

If, however, you find that there was a fraudulent intent in the sale, then you are at liberty to add to that amount such reasonable sum as may serve as punishment to the defendants for this fraudulent act. That sum is not to be ascertained by finding the highest price that the stock sold for in the market since, as counsel for the plaintiff contends. That is not the law which is to govern you in finding the amount of that -smart-money. You are to view the transaction as a whole; you are to view the degree of turpitude, if any, in the conduct of the defendants; and you are to give an approximate amount, in addition to the amount really due on the account, as a punishment to the defendants and a deterrent to other people. You are not to impart into that consideration feelings of vindictiveness or malice, or general prejudice. You are to bear yourselves as judges who know neither malice nor wrath, but who sit calmly and deliberate, and who, if they must punish, punish with requisite severity, but with judgment and with reason.]

Verdict and judgment for plaintiff for $7,000. Defendant appealed.

*Error assigned* among others was (2) portion of charge as above, quoting it.

*Ruby R. Vale*, with him *Alexander & Magill* and *Alfred Moore*, for appellants.—In cases of the conversion of stock certificates or bonds of similar securities, in the absence of a breach of trust or disregard of an obligation to deliver certain stock at a specified time, the measure of damages is the market value at the time and place of conversion with interest thereon to the time of trial, deducting therefrom, by way of recoupment, any moneys advanced by the pledgee on account of the purchase price of the stock or for expenses incurred: Neiler v. Kelley, 69 Pa. 403; Work v. Bennett, 70 Pa. 484; R. R. Co. v. English, 86 Pa. 247; Wilson v. Whitaker, 49 Pa. 114;

Montg. County Bank v. Reese, 26 Pa. 143; Reitenbaugh v. Ludwick, 31 Pa. 131; Musgrave v. Beckendorff, 53 Pa. 310; Persch v. Quiggle, 57 Pa. 247; Jennings v. Loeffler, 184 Pa. 318.

. *Gavin W. Hart,* with him *Edward D. McLoughlin,* for appellee.—The Pennsylvania decisions divide the cases of conversion of stock in which the highest price is the measure of damages into three classes:

1. Where there is a breach of fiduciary relations, as in Montg. County Bank v. Reese, 26 Pa. 143.

2. Where there is an obligation to deliver specific stock at a certain time, as in Reitenbaugh v. Ludwick, 31 Pa. 131, and Musgrave v. Beckendorff, 53 Pa. 310.

3. Where there are circumstances of fraud, malice, oppression, or other aggravation attending the conversion or detention, as pointed out in Montg. County Bank v. Reese, 26 Pa. 143; Conyngham's Appeal, 57 Pa. 474; Neiler v. Kelley, 69 Pa. 403, and other cases.

The plaintiff's case falls within the first and third classes because a pledgee is a trustee and because of the fraud practiced by the appellants which the jury have determined influenced the sale.

OPINION BY MR. JUSTICE THOMPSON, April 11, 1904:

The appellee was clearly entitled to recover and the main question in controversy turned upon the measure of damages in such recovery. The appellee purchased through appellants, as brokers, three hundred shares of the preferred stock of the American Tobacco Company for the sum of $18,000, and from time to time deposited with them sums of money amounting to $5,600 for the purpose of protecting them in a loan required to pay the amount of such stock so purchased. Having done so they held this stock as a pledge to secure the loan which represented an amount equal to the balance of the money, which had been required to make the purchase. On December 15, 1899, Friday, the appellee was at the banking office of the appellants and paid on account of such loan the sum of $3,000, although the sum of $1,000 was stated to be then necessary to protect appellants in consequence of the decline in the

price of the stock. This sum was a part of the $5,600. On this occasion appellee testified that he had more money with him to put up if he had been asked to do so by the appellants. On Monday following appellee was at appellants' office until a few minutes after two o'clock, when he left for his place of business. Up to the time he left a change of a few points in the price of the stock in question had taken place, and appellants said nothing to appellee about requiring additional money to protect the loan and at this time the loan was sufficiently protected. Some time after two o'clock on that day and without any authority from or notice to appellee, appellants sold his stock. Upon receiving notice of such sale the following morning appellee went to appellant's office and stated that they had no authority to sell his stock and that he intended to hold the same and had been and was always ready to protect them against any loss in the event of a decline in its price. He testifies : " I told him (one of appellants) that was an unjust way to deal with me. I said I was prepared as I told you in the presence of your brother on Friday that I was going to hold this tobacco and for this reason I put up the last $3,000 instead of $1,000."

After the purchase of this stock the relation as to it between appellee and appellants was that of pledgor and pledgee. It was a violation of appellants' duty as pledgee to sell the stock without notice to or authority from appellee, the pledgor, and was a wrongful conversion of it. It is unnecessary to discuss the causes which induced the appellants to make the sale in question. It is sufficient to say that in making the sale without notice to or any authority from the appellee, they were guilty of a violation of the trust imposed upon them as pledgee and their action was wrongful. For such wrongful conversion, the measure of damages, which the appellee was entitled to recover, was the highest price of the stock between the date of the conversion and that of the trial. The sale made by them with the notice and statement sent by them was a wrongful conversion and a distinctive refusal to deliver the stock from that day up to the trial and for such conversion therefore the measure of damages was the highest price of the stock in the market up to the date of such trial. While it is true that in the case of conversion of ordinary chattels, the measure of

damages is the value at the time of the conversion, yet in view of the shifting character of the prices of stock in our stock exchanges, such rule would be manifestly inadequate. It has therefore been held that stocks are an exception to the rule in question and the highest price in the market is consequently made the measure of damages.

The foundation of this rule rests upon the changing character of the value of such property as evidenced by the varying quotations in the different stock markets and sometimes the advances in valuation are made with astonishing rapidity. Political action or material or financial combinations often are the occasion of such exceptional advances. The very nature of such property with its constantly changing valuations indicates the necessity of a measure of damages shifting in character, and hence it has been made to differ from that in the case of ordinary chattels where it is based upon their valuation at the time of the conversion, because such value is not so changeable. Such difference is clearly marked in the leading case of Montgomery County Bank v. Reese, 26 Pa. 143, where Chief Justice LEWIS says : " If a bank or any other trustee might deprive the cestui que trust of his stock, without answering for the rise in the value, the beneficial owner would be deprived of the very advantage which he had in view when he made the investment. It is plain therefore, that the ordinary measure of damages, for the conversion or refusal to deliver chattels of determinate value and unlimited production, will not reach the justice of the case when applied to bank stock." Again he says : " It is a settled principle in the court of chancery that where a trustee sells stock contrary to his trust the cestui que trust is entitled to his election, to have the stock replaced or the produce of it with the highest interest: Hart v. Ten Eyck, 2 Johns. Ch. 62, 117 ; Forrest v. Elwes, 4 Ves. 492 ; Pocock v. Reddington, 5 Ves. 794. If the cestui que trust has an election in equity to have the stock replaced, why shall he not have its value in an action at law where he cannot have the stock itself. If the chancellor would compel the trustee to go into the market and purchase stock to replace what he had improperly sold, although it had risen in value in the meantime, is not that done upon the principle that he is liable for the increased value ? And when a court of law compels him to

pay that increased value, it does nothing more than prescribe the same rule of justice which a court of equity enforces in another form."

In Neiler v. Kelley, 69 Pa. 403, it is said by Mr. Justice SHARSWOOD: "The general rule as to the measure of damages in an action of trover, undoubtedly is well settled to be the value of the goods at the time of the conversion, to which may be added interest up to the time of the trial, unless there were some circumstances of outrage in the case, when the jury may give more : Jacoby v. Laussatt, 6 S. & R. 300 ; Dennis v. Barber, 6 S. & R. 420 ; Berry v. Vantries, 12 S. & R. 89 ; Taylor v. Morgan, 3 Watts, 333 ; Harger v. McMains, 4 Watts, 418. This rule may be considered to have been, to some extent, modified as to stocks, railroad bonds and other securities of a similar nature, by the cases of The Bank of Montgomery v. Reese, 26 Pa. 143; Reitenbaugh v. Ludwick, 31 Pa. 131; Persch v. Quiggle, 57 Pa. 247, and perhaps others."

In Coningham's Appeal, 57 Pa. 474, it is said by the same judge : "The stocks were still a mere pledge ; their dividends and accretions belonged to the pledgor. After the unauthorized sale of them to third persons, they are also in equity chargeable with what would have been received had they retained them, as they ought to have done until the equity of redemption in the complainant was foreclosed by a sale after notice in the manner prescribed by law. It follows that they must account to the plaintiff and the appellant for the value of the stock at the highest rate which it has at any time since attained in the market."

It is contended however by the appellants that such measure of damages cannot be applied in the present case because no specified time was fixed for the delivery of the stock wrongfully converted. The appellee reserved the right to sell it upon any occasion that he might desire to do so, intending to provide for a sale in case the prices of the stock market should at any time induce him to conclude to do so, and thus each day was understood and intended for such delivery, if the appellee so desired and with the duty so to deliver, the sale was a distinctive refusal to do so. A different conclusion, where stocks are thus pledged, might cause a sacrifice without any regard whatever for the rights of the pledgors and when

so sacrificed they might be substantially remediless. It is also contended that there could be no recovery because there was no demand or tender by appellee. The appellants sold the stock pledged by the appellee without notice to him or authority from him to do so. They gave him notice that they had sold and they gave him a statement of the results of such sale. He promptly called upon appellants and denied their authority to make the sale and then stated that he had always been ready to protect his loan for which the stocks were pledged and that he was still ready to do so. If they sold and parted with the stocks under the circumstances shown, without authority of appellee and without notice to him of their intended action, a tender on the part of the appellee became unnecessary. Such conversion dispensed with the necessity of any tender before suit brought. A tender would have been a vain and useless act, " Lex neminem cogit ad vana .seu inutilia."

It is clear that if the measure of damages as above stated had been applied in the present case the verdict would doubtless have been greatly in excess of what it was, probably to an extent almost double. The learned trial judge in fixing a lower standard for the measure of damages from which the jury found a smaller verdict than otherwise they would have been warranted in finding, cannot successfully be charged with doing that which was harmful to appellants. On the contrary they were advantaged by it and if so it is no ground for reversal.

The assignments of error are not sustained and the judgment is affirmed.