## Wilson *v.* Malenock, Appellant.

Argued April 26, 1937.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker, James and Rhodes, JJ.

*A. C. Christiansen,* for appellant.

*Ronald D. Negley,* of *Negley, Negley & Patterson,* for appellee.

Opinion by Cunningham, J., October 13, 1937:

The dispute in this case was whether the defendant, an auto-body repairman who rebuilt plaintiff's car, had

a common law lien for the cost of the repairs, or, by contract, waived his lien and was therefore liable to plaintiff in an action of trespass for converting the car through refusing to deliver it to him until the repair bill was paid.

The back of plaintiff's 1930 Chevrolet car was damaged on April 14, 1936, as the result of a collision with a car owned by one Brock. Brock promised plaintiff to pay for the repairs to plaintiff's car, and, through his wife, told plaintiff to take the damaged car to defendant's garage; plaintiff did so on April 18th although he had not known defendant previously.

As a result of a conversation with defendant, the details of, and circumstances surrounding which, give rise to the crucial point in this case, plaintiff left his car with defendant who repaired it some two weeks later. Plaintiff made written demand for the return of the car on July 16, 1936; defendant replied by giving written notice of his alleged common law lien for repairs in the amount of $46 and of his intention to sell under the Act of May 7, 1925, P. L. 557, 6 PS §11, if the lien was not paid.

Plaintiff subsequently brought this action of trespass based on the theory of a conversion of his car by defendant. The court below, SOFFEL J., sitting without a jury, found for plaintiff for the value of the car, as repaired, at the time of defendant's refusal to redeliver, namely $106. The basis for the decision of the court below was its finding of fact "that Malenock agreed to repair Wilson's car, the understanding being that the cost of the repairs was to be paid solely by Brock." The trial court concluded that defendant had no common law lien because "there were no contractual relations between the owner of the property and the person claiming the lien out of which the implication of [the] existence of [a] common law lien [might arise]."

It is plain in this state that, in absence of circum-

stances showing a contrary intention, a person who repairs a chattel at the instance of the owner or his authorized agent, has a common law lien or right to retain possession of the chattel until paid. In *M'-Intyre v. Carver*, 2 W. & S. 392, a carpenter to whom certain doors had been delivered to finish was held to have a common law lien for the labor bestowed upon the goods, GIBSON, C. J., stating (p. 395) : "It is not to be doubted that the law of particular or specific lien on goods in the hands of a tradesman or artisan for the price of the work done on them, though there is no trace of its recognition in our own books, was brought hither by our ancestors; and that it is a part of our common law." This common law lien is apparently implied by law out of the relations of the parties: *Hoover v. Epler*, 52 Pa. 522. Thus, in *Saxton v. Gemehl*, 72 Pa. Superior Ct. 177, the bailee of a car for purposes of storage and sale, who also repaired it, was held, in an action of replevin by the owner, to have a lien for storage charges as well as for repairs. The Superior Court reversed the court below and held that defendant had not lost his lien for repairs because he also claimed a lien for storage.

*Mathias v. Sellers*, 86 Pa. 486, is perhaps the leading case in this jurisdiction dealing with a repairman's common law lien and the waiver thereof. There, plaintiff brought an action of replevin to recover certain tobacco bailed to defendant who had made it up into cigars. The Supreme Court held that defendant was entitled to a lien on the tobacco as made into cigars, for the labor expended thereon and pointed out that there was no special agreement between the bailor and bailee whereby the latter had waived his lien. WOODWARD J., stated (p. 491) : "It has long been a settled rule of the common law, that goods deposited with a tradesman or artisan for manufacture or repair, are subject for the work done on them to a specific lien.

Thus, a tailor who has made a suit of garments out of the cloth delivered to him, is not bound to deliver the suit to his employer until he is paid for his services. ...... A particular lien is given by the common law to any one who takes property in the way of his trade or occupation, to bestow labor and expense upon it. And it exists equally whether there be an agreement to pay a stipulated price, or only an implied contract to pay a reasonable price: 2 Kent's Com. 635. It was said by HOLROYD, J., *Crawshay v. Homfray,* 4 Barn. & Ald. 50, that the principle laid down in *Chase v. Wetmore,* 5 Maule & Sel. 180, where all the cases came under the consideration of the court, was this, that a special agreement did not of itself destroy the right to retain; but that it did so only where it contained some special term inconsistent with that right. In 2 Selwyn's Nisi Prius 540, the rule is stated to be, that the right of detaining a thing until the money due upon it be paid, may be waived by a special agreement as to the time or mode of payment; but not merely by an argument for the payment of a fixed sum."

It is equally well settled that the parties to the bailment may enter into a contract expressly providing that no lien for repairs shall arise; or if the contract between the parties be inconsistent with a lien, the lien does not exist. As stated in 3 Ruling Case Law, page 122, Section 44: "But all these cases where a lien for services exists are subject to the condition that there is nothing in the contract for doing the work inconsistent with the right of lien."

Turning to the facts of the present case, does the evidence show that defendant's words and acts were so inconsistent with an intention to claim and rely upon a lien that it would be deemed to have been waived? Plaintiff testified concerning the conversation he had with defendant the day he took his car to the garage, as follows: "Q. Now then, just what was your ar-

rangement with Mr. Malenock? A. I took the car down to Malenock's garage, and I told him that I was asked to bring the car there to his garage and that it would be taken care of. He informed me that he knew nothing whatsoever of the situation. So I started to take my car away, and he said, 'Wait, I will call.' So Mr. Malenock called. Q. In your presence? A. No, I was outside the office. I saw him call, but I don't know who he called [on the 'phone], but he came out and informed me to leave the car; that it would be taken care of. Q. Did or did not Mr. Malenock say anything about returning the car to you? A. He told me that the car would be ready in approximately a week. Q. Was your understanding clear that Mr. Brock was to be responsible for the bill? A. Oh, yes. I went to take the car away, when he said he would call up, and then he came out, and said to leave the car, that it would be taken care of. Q. Did you make it clear to Mr. Malenock that you were not going to pay the bill? A. Yes, sir, I told him the circumstances of the case, and I told him that Mrs. Brock told me to bring the car down to his garage. Q. Did Mr. Malenock seem to know who Mr. Brock was? A. Evidently he had heard something of the case."

Further, on cross-examination, plaintiff said: "Q. Was anything said about releasing the car? A. Mr. Malenock refused to release the car until it was paid for. Q. Did he say anything about releasing the car without his bill being paid? A. He never mentioned that." On redirect examination plaintiff again testified: "Q. Did you understand at that time that you would have to pay for the repairs when you got the car, in about a week? A. No. Q. Who would have to pay? A. He would look to Mr. Brock for payment."

Defendant testified he told plaintiff, when he left his car with him, that it would have to be paid for regardless of who paid for it, that an hour after plaintiff left the car he received a telephone call from a fellow he

knew as "Scotty" who worked in a Chevrolet garage, that "Scotty" told him to go ahead and repair the car. Certain statements made by defendant on cross-examination constitute perhaps the strongest testimony in plaintiff's favor. Defendant, after explaining that plaintiff called him on the 'phone the afternoon of the day he left the car, continued: "Yes, he asked me if anyone had called in regards to repairing that automobile. Q. What did you say? A. I said that a man named 'Scotty' had called....... Q. Now, at that time, did 'Scotty' know Mr. Brock? A. Well, I don't know that. Q. Did you ask 'Scotty' what connection he had with the case? A. No, I did not. Q. *Did you repair the car then on 'Scotty's' word?* A. *Yes.* Q. Whom did you agree to look to for the payment of the repairs? A. I explained to 'Scotty' the same as I explained to Wilson, that the automobile would have to be paid for before I would release it. Q. Who did you and 'Scotty' agree was going to pay for the repairs to the car? A. Well, he said, *'We will pay for it.'* Q. Meaning whom? A. I don't know whom he meant by 'We,' whether he or Wilson, I don't know. Q. Did 'Scotty' say that he had 'phoned for Wilson? A. No, he did not say that. Q. *Your position then, Mr. Malenock, is that you repaired the car then on 'Scotty's' word?* A. *Yes.* Q. *And not on Mr. Wilson's word?* A. *No."* (Italics supplied).

The above excerpts include the only testimony relative to the oral agreement between plaintiff and defendant at the time plaintiff delivered his car in person to defendant for repairs.

The evidence regarding the circumstances surrounding this transaction is far from being as definite and complete as a trier of facts would naturally desire. For instance the relation, if any, between "Scotty" and Brock has been left entirely to inference.

But it must be kept in mind that these parties waived a jury trial and conferred upon the trial judge the right

and duty to weigh the evidence, pass upon the credibility of the witnesses and draw any inferences fairly deducible not only from the testimony of the parties upon the stand but also from the circumstances appearing in evidence.

The findings of a judge trying a case without a jury, by agreement of the parties, are binding upon us if supported by competent evidence, regardless of whether we would independently have made the same findings: *Armstrong County v. Rearic,* 315 Pa. 133, 135, 172 A. 130, *Anastasi Bros. Corp. v. Penna. Co. etc.* 317 Pa. 319, 176 A. 732; *Wallace et al. v. Moyer et al.,* 317 Pa. 287, 176 A. 736; *Goldman v. Nat. Refrig. Co., Inc.,* 120 Pa. Superior Ct. 458, 460, 182 A. 730; *McKeage Mach. Co. v. O. & S. Mach. Co.,* 124 Pa. Superior Ct. 387, 392, 188 A. 543. "As the court below was the fact finding body, inferences to be drawn from the evidence and questions concerning the weight of the evidence were properly for its determination: *Eichman v. Hersker,* 170 Pa. 402, 410; *Com. v. Phila. & R. Coal & Iron Co.,* 145 Pa. 74, 82": *Meitner et al. v. Scarborough,* 321 Pa. 212, 215, 184 A. 81.

Plaintiff had the burden of producing evidence, circumstantial or otherwise, which would reasonably support an inference that "Scotty" was acting for Brock, or at least that Malenock must have known (or acted toward plaintiff as though he knew) that "Scotty" was so acting in ordering defendant to go ahead with the repairs to the car. While the evidence tending to show that Malenock knew of some connection between "Scotty" and Brock is rather meagre, we think when the testimony is considered as a whole in the light of the circumstances surrounding plaintiff's delivery of his car to defendant, and particularly the fact that defendant went ahead with the repairs only after receiving a 'phone call from "Scotty," it supports a finding that Malenock knew, or at least gave plaintiff the im-

pression he knew, that "Scotty" had authority from Brock in this matter. Defendant, speaking of his conversation with plaintiff at the time of the delivery, stated: "He said, 'Well, has anybody been here?' I said, 'No.' Well, he mentioned a name—I think it was Brock—and he said, 'He wrecked my car, and told me to come here and have it repaired and he would pay for it.' " Later, on cross-examination, defendant made the following statement which is rather significant in view of the fact defendant admittedly knew plaintiff expected Brock to pay for the repairs: "Q. How did 'Scotty' know about this car being in your garage? A. I don't know, unless he was with Brock at the time of the wreck."

We cannot say that this evidence, together with the other facts presented, did not justify the findings that Malenock either knew or assumed that "Scotty" was acting for Brock, and that, by repairing on "Scotty's" word, he undertook to look solely to Brock for payment. The conclusion of law that Malenock waived his lien for the value of the repairs naturally follows.

The damages in this action were properly held to be the value of the car as of the time of the conversion, viz., when defendant unjustifiedly attempted to assert a lien and refused delivery to plaintiff: *Jacoby v. Laussatt,* 6 S. & R. 300; *Neiler v. Kelley,* 69 Pa. 403; *Learock v. Paxson,* 208 Pa. 602, 57 A. 1097; and *Withrow v. Walker,* 41 Pa. Superior Ct. 155.

Judgment affirmed.