**LURIA BROTHERS & COMPANY, INC.,
a corporation, Plaintiff,**

v.

**Thomas R. ALLEN, Jr., and Morton J.
Greene, trading as Economy Industrial
Properties, a partnership, Defendants.**

**Civ. A. No. 77–137.**

United States District Court,
W. D. Pennsylvania.

May 11, 1978.

Charles R. Taylor, Jr., P. Jerome Richey, Pittsburgh, Pa., for plaintiff.

Edward C. Leckey, Pittsburgh, Pa., for defendants.

## MEMORANDUM OPINION AND ORDER

TEITELBAUM, District Judge.

This is an action under 42 U.S.C. § 1983 brought by Luria Brothers & Company, Inc. ("Luria") against Thomas R. Allen, Jr. and Morton J. Greene trading as Economy Industrial Properties ("Economy"), a partnership, in which Luria claims that Economy

violated the Fourteenth Amendment of the Constitution of the United States by depriving Luria of possession of certain steel plate without due process of law. In a separate count contained in the amended complaint Luria also brings an action in the nature of a replevin action against Economy.

During the course of the proceedings, Luria filed a bond in the amount of $90,000 pursuant to Order of Court which authorized Luria to remove the steel plate from the premises of Economy. The condition of this bond is such that if Luria establishes its right to possession of the steel plate the obligation is null and void. Otherwise, Luria and its surety are obligated to pay defendants the value of the plate and costs of the proceeding.

On a continuing basis prior to December of 1976, Luria stored certain steel plate in a building located in Ambridge, Pennsylvania. In mid-December of 1976, Luria received word through Ogden Metals, Inc. ("Ogden Metals"), its parent corporation, that the steel plate had been distrained upon by Economy, owner of the building. Upon further inquiry, Luria determined that all access gates through which the steel plate could be removed had been locked.

The building in question located in Ambridge was leased by Economy to Bollinger under a lease dated June 13, 1975. Thereafter, a portion of the building, approximately one-half, was leased by Bollinger to Ogden Metals under a sublease dated July 7, 1975.

Although there was some discussion about the advisability of making Luria the sublessee under the sublease, Ogden Metals remained on the sublease as sublessee at the time the sublease was executed by the parties in July and August of 1975.

At the time the sublease was executed by Allen on behalf of Bollinger, Allen was both a partner in Economy and the President of Bollinger. At that time he was also a member of the Board of Directors of Bollinger. Greene at the time was an officer of Bollinger and a member of its Board of Directors. Various members of the Greene family owned a substantial number of the shares of Bollinger and Greene himself is a trustee of the Morton J. Greene Company Pension Trust which holds in excess of 200,000 Bollinger shares.

By December of 1976, Luria, acting through Ogden Steel, had placed 407 tons of steel plate on the subleased premises with the consent and permission of Ogden Metals.

Ogden Metals paid $24,000 in rent in advance at or about the time it entered into the sublease with Bollinger. In Paragraph 20 both the lease and the sublease contain identical language relating to the distraint rights of the landlord and sublandlord, as follows:

*As security for rent, LESSEE grants, bargains and sells to LESSOR all property of every kind on or to be brought on the DEMISED PREMISES, and whenever rent, or anything reserved as rent, is unpaid, LESSOR may seize or distrain said property, on or off the premises, and sell the same on due legal notice for all rent or other payment due as rent, expenses, etc., and for all rent not due hold the same as security.*

On March 31, 1976, Bollinger filed a petition for an arrangement under Chapter XI of the Bankruptcy Act in the United States District Court for the Western District of Pennsylvania at No. 76–282. At the time the Petition was filed, an order was entered by the Bankruptcy Judge staying any and all proceedings relating to Bollinger. Carl L. Bigler was appointed Receiver for Bollinger by the court and through him the Chapter XI proceedings were conducted until March 14, 1977 when Bollinger was adjudicated a bankrupt. The Receiver continued to operate Bollinger until on or about October 31, 1976 when most of the remaining employees were terminated.

On or about November 3 or 4, 1976, the Receiver discontinued any further activity at the leased premises and by November 5 had removed everything to a facility in the near vicinity owned by Bollinger. Both prior and subsequent to the removal, the Receiver and Robert G. Sable his attorney,

advised both Greene and Allen that the Receiver did not intend to use the premises any longer.

On November 16, 1976, Messrs. Bigler, Sable, Allen and Greene met at the Marriott Inn to discuss various outstanding matters involving Economy and Bollinger. Areas of concern related to a forklift being held by Economy which Bollinger wanted to reacquire; administrative rent to be paid during the period of occupancy by the Receiver from April 1 through November 5; outstanding real estate taxes and other matters of a business nature. On November 23, 1976 Sable sent a letter confirming the meeting to Bigler, Allen and Greene. Greene redrafted the letter and forwarded a copy of same to Sable. Allen, on the other hand, made only a few written changes to the letter and returned it with an indication that it was *"okay as noted."* One of the handwritten notes provided that *"Receiver will formally terminate & abandon lease on Nov. 5."*

In early December of 1976, Greene took certain steps to prevent third parties from removing any items contained in the subject premises, including the steel plate owned by Luria. On or about December 1 or 2, 1976, Greene caused Economy padlocks to be placed on the primary gates leading into the subleased premises and through which the steel plate could have been removed. After a telephone discussion with counsel on December 3, 1976, Allen entered the subleased premises on December 4, 1976 through an adjoining building owned by Economy and thumbtacked a notice of distraint on a doorway leading into certain offices located within the subleased premises. The notice was signed by Allen on behalf of Economy and contained the following language:

*NOTICE OF DISTRAINT*
*TO: BOLLINGER CORPORATION*
*and*
*OGDEN METALS, INC.*

*TAKE NOTICE, that ECONOMY INDUSTRIAL PROPERTIES, owner of the premises and landlord, on December 4, 1976, distrained upon the goods and chattels of OGDEN METALS, INC., to wit, 300 tons of steel plate, more or less, located in the premises at Eleventh Street and P.C.R.R. Belt Line, Borough of Ambridge, Beaver County, Pennsylvania, for Two Hundred Ninety-three Thousand One Hundred Forty-five and 70/100ths ($293,145.70) Dollars rent due ECONOMY INDUSTRIAL PROPERTIES. If the said rent is not paid, or replevin action instituted to recover the said goods within five (5) days after notice hreof, (sic) the undersigned may cause the said goods to be appraised and sold.*

*Give (sic) by the undersigned this 6th day of December, 1976.*

ECONOMY INDUSTRIAL
PROPERTIES
By /s/ Thomas R. Allen, Jr.
Partner

The $293,145.70 figure set forth in the Notice of Distraint is a total of $9,600 rent due prior to the receivership, $7,945.70 in administrative rent due during the period of receivership ($1,464.90 per month was paid by the Receiver during this period) and the balance, namely, $275,600 is accelerated rent due for the remaining period of the lease which expires on August 31, 1985.

Between November of 1976 and May 13, 1977, Luria was denied access to the subleased premises and was unable to remove the steel plate in question. On May 13, 1977 the court entered an Order permitting plaintiff after filing a bond to remove the steel plate. The condition of the bond is such that if Luria establishes its right to possession of the steel plate the obligation ($90,000) is null and void. Otherwise Luria and its surety are obligated to pay Economy the value of the plate.

COUNT ONE

■ The Constitutionality of distraint under the Pennsylvania Landlord & Tenant Act of 1951, 68 P.S. § 250.302, et seq. has previously been tested in the United States District Court for the Western District of Pennsylvania and found to be wanting. *Ragin v. Schwartz*, 393 F.Supp. 152 (W.D. Pa.1975). *Ragin* held that the Pennsylvania

statute, which authorizes the landlord to distrain a tenant's personal property for unpaid rent without notice or hearing and, upon the tenant's failure to replevy the goods within five days, to have the sheriff or constable sell such property at public sale upon six days' notice, violates the requirements of due process. Although *Ragin* involved both a seizure and sale of property, the Court acknowledged that seizure alone, without appropriate procedural safeguards, could provide the basis for a deprivation of due process claim:

> "In the context of this case, the question is whether the seizure of property without a chance to be heard violates this procedural due process? While there is available to the tenant the Trespass Action, the Replevin Action, and the Action for Defalcation, . . . the tenant here is deprived of the unfettered use of property during the interim between the Distraint and the outcome of any of these actions. . . . The Plaintiffs have shown that the Constable in this case acted pursuant to the Act, as the Distraint Notice itself indicates and, without prior notice, entered the plaintiff's premises and made a physical levy on the property as set forth in the Inventory. This indeed is an adequate basis for finding the provisions of Article III of the Act to be violative of the Fourteenth Amendment." (citations omitted)

There can be little doubt in light of *Ragin* that Economy's summary seizure of Luria's steel plate was in contravention of the Fourteenth Amendment due process guarantee. This is particularly so where Economy distrained upon goods of a stranger to both the Economy-Bollinger lease and the Bollinger-Ogden Metals sublease.[1] Perhaps no other modern device is more emblematic of due process disregard than the instant species of landlord distraint without prior notice or an opportunity to be heard.

▮▮▮▮ Determining that Economy's distraint in the case *sub judice* lacks adequate

Constitutional safeguards does not, however, conclude our journey. *"It is well-settled that the fourteenth amendment applies only to actions of the 'States' and not to actions which are 'private.' Under 42 U.S.C. § 1983, the 'under color of state law' requirement is the same as the 'state action' requirement of the fourteenth amendment."* Gibbs v. Titelman, 502 F.2d 1107, 1110 (3d Cir. 1974). The state action requirement in *Ragin* was easily satisfied because the levy and sale were conducted by the sheriff. Where, as here, the distraint is initiated by a private corporate party, *Ragin* is of limited precedential value as to the issue of state action. Whether or not state action exists in the instant case must be determined by reference to the most recent Third Circuit Court of Appeals pronouncements in the case of *Parks v. Mr. Ford*, 556 F.2d 132 (3d Cir. 1977).

*Parks* was a civil rights action by owners of motor vehicles which had been retained by garagemen pursuant to a Pennsylvania common-law garageman's lien against the garagemen, with one owner seeking to enjoin the sale of his automobile to satisfy the lien. The Court of Appeals held, *inter alia*, that the exercise of the common-law garageman's lien did not constitute state action taken under color of state law but sale of the automobile, pursuant to statute, did constitute state action. Pennsylvania <u>common law</u> gave the repairman a lien on those items which he repaired and permitted him to retain possession of them until payment for the work performed. *Wilson v. Malenock*, 128 Pa.Super. 544, 194 A. 508 (1937). The right of a repairman whose bill was not paid to sell those items retained under the common law lien, however, was of <u>statutory</u> origin. Pa.Stat.Ann. Title 6, §§ 11–14 (1963).

As stated in *Parks, supra* at 138, *"the ancient origin of the challenged activity is highly relevant."* In the case <u>sub judice,</u> it is therefore critical to examine the historical underpinnings of landlord distraint.

---

1. Although there has been considerable effort by both parties to disregard separate corporate entities when convenient to their respective interests, the evidence elicited at trial supports the proposition that Luria was a distinct entity from Ogden Metals and Economy distinct from Bollinger and that both parties understood them to be so and treated them as such.

■ Under Pennsylvania common law the landlord had no right to distrain upon the goods of a subtenant where the subtenancy was recognized by the landlord. *McComb's & Howden's Appeal,* 43 Pa. 435 (1862); 22 P.L.E. Landlord and Tenant § 367, p. 158. Where the subject of distraint is a stranger related in interest to the subtenant, the common law made no contrary provision. Under Pennsylvania common law, therefore, contacts between the landlord and "distrainee" were of paramount importance.

The landlord in the instant case, Economy, was well aware of Luria's intention to store steel plate on its premises inasmuch as the partners of Economy were also significant figures in the corporate structure of Bollinger at the time the Bollinger-Ogden Metals sublease was executed.[2] Therefore, Economy, through Bollinger, was cognizant of the aborted effort to make Luria party to the sublease rather than Ogden Metals. The substantial similarity of identity between Economy and Bollinger would have been sufficient at common law to constitute an implied approval of Luria's use of the premises. Had Economy not impliedly agreed to permit Luria's storage of steel plate, such plate would have been subject to distraint by Economy at common law. 22 P.L.E. Landlord and Tenant § 366, p. 157. It is therefore Economy's implied consent *vis a vis* Luria which constructs the basis for concluding that Economy possessed no common law right to distrain upon the goods of Luria.[3]

Having determined that Economy possessed no common law right of distraint against Luria in the instant factual milieu, the effect of such a historical position remains to be explored. *Parks* indicates that statutory sanction for an unrecognized procedure at common law can be the predicate for a finding of state action:

·*"In contrast to our view that state action is not present when a vehicle is retained under the common law lien, we believe that state action is present when a garageman sells a customer's vehicle under the statutory scheme just described. First, the garageman's power to sell property retained under his common law lien, unlike the lien itself, was not authorized prior to the enactment of the statute in 1925 and arises solely from that legislation." Parks, supra at 141. (emphasis added)*

*Parks'* apparent conclusion that statutory codification of the common law cannot support a finding of state action, even though statutory creation of rights can support such a finding, has its roots in *Gibbs v. Titelman, supra* where Judge Hunter wrote:

*"The case before us is vastly dissimilar to the situation in Reitman [Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830]. Appellees concede that the self-help remedy of repossession 'existed in some form in the common law from a very early time.' Unlike Reitman then, the State of Pennsylvania has not by the enactment of the MVSFA (Motor Vehicle Sales Finance Act) permitted a practice which was formerly prohibited." Gibbs, supra at 1111.*

As in *Parks,* and distinguished from *Gibbs,* Economy's distraint rights arose solely from the Pennsylvania Landlord & Tenant Act. State involvement in the case sub judice is therefore properly found.

■ Accordingly, Luria is entitled to relief under 42 U.S.C. § 1983 because of defendant's distraint upon Luria's steel plate.

2. While Bollinger and Economy were intended and understood to be distinct entities, knowledge which can be fairly attributable to each is in large part a function of the activities of the other.

3. A contrary holding at common law would have resulted in the following unlikely scenario. Economy executes a lease with its brother corporation Bollinger. Bollinger then executes a sublease with a brother corporation of Luria, Ogden Metals. Economy through its brother Bollinger knows that Luria will be using the premises and feels such a relationship to be financially advantageous. When brother Bollinger fails to pay Economy rent due and owing, goods of Luria are used to satisfy Bollinger's obligation even though Luria has already paid its rent to Bollinger. In effect, Luria is forced to pay all family debts rather than only those for which it is personally responsible.

## COUNT TWO

■ This Court is additionally of the opinion that Luria is entitled to relief under the replevin count of the amended complaint. Evidence adduced at trial indicates that Bollinger had surrendered its lease to Economy prior to the seizure of Luria's steel plate. Accordingly, there was no landlord-tenant relationship between Economy and Bollinger which could provide the basis for any landlord distraint.

Because of various outstanding claims against Bollinger by Economy and by the First National Bank of Washington, Greene, Bigler, Allen and Sable, attorney for the receiver, met together on November 16, 1973 to resolve several problems. The Chapter XI proceedings, which were initiated on March 31, 1976, had been pending for several months. On November 23, 1976, Sable sent a letter confirming the discussions of November 16 to Bigler, Allen and Greene. In response, both Greene and Allen recognized that Bollinger had surrendered its leasehold to Economy as of November 5, 1976. Greene agreed that "[t]he receiver will pay the sum of $500 for base rental of the leased Economy property for the period November 1 through November 5, 1976, on which date receiver surrendered the premises to Economy." Allen similarly agreed that "[t]he receiver will pay the sum of $500 for use and occupancy for the Economy property for the period November 1 through November 5, 1976 with the understanding that this is in full payment of the use and occupancy for the period after October 1, 1976. Receiver will formally terminate lease on November 5 and abandon." Allen himself added the last sentence to the November 23, 1976 letter of Sable in an attempt to clarify the agreement. Therefore, while the precise language embodying the parties' agreement is somewhat unclear, an agreement to surrender Bollinger's leasehold as of November 5, 1976 was concluded.

4. The prohibition of distraint would similarly extend to a stranger to the sublease. The critical factor is that Economy no longer possesses the authority and rights of a landlord.

Having established that Bollinger surrendered its leasehold to Economy as of November 5, 1976, the attempted distraint by Economy on December 4, 1976 was ineffectual. It would appear that under the provisions of the Landlord and Tenant Act of 1951, a subtenant's goods are not subject to distress for arrears of rent due on a lease which has terminated.[4] 22 P.L.E. Landlord and Tenant § 367, p. 159. Having surrendered its rights under the lease between Economy and Bollinger, Economy had no right to distrain upon the goods of Luria.

## CONCLUSION

Luria paid Bollinger rent under the Ogden Metals-Bollinger sublease. Allen was President of Bollinger at the time the sublease was executed. Greene and his family are major shareholders of Bollinger owing approximately 70% of its stock.[5] Bollinger failed to pay Economy rent and the cost of roof repairs owing. Allen and Greene are 50–50 business partners in Economy. Allen and Greene, d/b/a Economy, then seized the steel plate of Luria for the rent which Allen and Greene, d/b/a Bollinger, had not paid themselves. From the foregoing it is apparent that equitable considerations also overwhelmingly mitigate in favor of Luria in addition to the legal bases previously articulated. On all possible grounds justice demands that the tactical squeeze placed upon Luria, an innocent party who had fulfilled its own financial obligations, be redressed.

5. Tr. p. 128.