**596**

LURIA BROTHERS & CO., INC., a
corporation, Plaintiff,

v.

Thomas R. ALLEN, Jr. and Morton J.
Greene, trading as Economy Industrial
Properties, a partnership, Defendants.

Civ. A. No. 77–137.

United States District Court,
W. D. Pennsylvania.

March 5, 1981.

Charles R. Taylor, Jr., Moorhead & Knox,
Pittsburgh, Pa., for plaintiff.

Edward C. Leckey, Charles J. Duffy, Jr.,
Pittsburgh, Pa., for defendants.

## OPINION

TEITELBAUM, District Judge.

This opinion should dispose of the out-
standing motions and claims of the parties

before this Court in the matter *sub judice.* Before turning to the pending problems, however, a brief review of the history of this litigation seems in order.

In February of 1977, the plaintiff filed the instant action alleging that the distraint of the plaintiff's property by the defendants illegally deprived the plaintiff of its goods. Jurisdiction was said to exist both on the basis of diversity and federal civil rights legislation. The defendants denied the material allegations of the plaintiff and filed a counterclaim contending that the distraint was proper and seeking judicial authorization for the sale of the distrained property. The plaintiff denied the substance of that counterclaim.

Out of consideration for judicial economy and convenience of the parties, the trial of the merits of this complex litigation was severed into three stages. The first stage, the plaintiff's allegations, was tried before the Court without a jury. On May 11, 1978 this Court found the defendants were liable to the plaintiff.[1]

Thereafter, a jury considered the amount of damages, if any, to be awarded the plaintiff.[2] The jury was asked in deliberating to consider and answer special interrogatories. From the answers provided by the jury, the Court then framed a judgment awarding the plaintiff $26,858.52 as compensatory damages, $15,000.00 as punitive damages and $2,336.81 as interest, as well as costs.

As originally contemplated, the third stage of this litigation was to be a consideration by the Court of the defendants' counterclaim. The time for a decision on the counterclaim has now arrived. In addition, the Court has been presented with the plaintiff's motion for an award of attorney fees and the defendants' motions for judgment n. o. v. and/or a new trial. The resolution of these motions is also ripe for determination.

Having reviewed the procedural posture of this litigation, a review of the facts seems to be appropriate. The earlier findings of this Court provide the most convenient statement.

On a continuing basis prior to December of 1976, Luria [Bros.] stored certain steel plate in a building located in Ambridge, Pennsylvania. In mid-December of 1976, Luria received word through Ogden Metals, Inc. ("Ogden Metals"), its parent corporation, that the steel plate had been distrained upon by Economy, owner of the building. Upon further inquiry, Luria determined that all access gates through which the steel plate could be removed had been locked.

The building in question located in Ambridge was leased by Economy to Bollinger [Corporation] under a lease dated June 13, 1975. Thereafter, a portion of the building, approximately one-half, was leased by Bollinger to Ogden Metals under a sublease dated July 7, 1975.

Although there was some discussion about the advisability of making Luria the sublessee under the sublease, Ogden Metals remained on the sublease as sublessee at the time the sublease was executed by the parties in July and August of 1975.

At the time the sublease was executed by Allen on behalf of Bollinger, Allen was both a partner in Economy and the President of Bollinger. At that time he was also a member of the Board of Directors of Bollinger. Greene at the time was an officer of Bollinger and a member of its Board of Directors. Various members of the Greene family owned a substantial number of the shares of Bollinger and Greene himself is a trustee of the Morton J. Greene Company Pension Trust which holds in excess of 200,000 Bollinger shares.

By December of 1976, Luria, acting through Ogden Steel [a division of Luria Bros.], had placed 407 tons of steel plate on the subleased premises with the consent and permission of Ogden Metals.

1. That opinion is reported as *Luria Bros. & Co. v. Allen*, 452 F.Supp. 732 (W.D.Pa.1978).

2. A jury was empaneled only to decide the question of damages, if any, since that was the extent of the jury demand.

Ogden Metals paid $24,000 in rent in advance at or about the time it entered into the sublease with Bollinger. In Paragraph 20 both the lease and the sublease contain identical language relating to the distraint rights of the landlord and sublandlord, as follows:

As security for rent, LESSEE grants, bargains and sells to LESSOR all property of every kind on or to be brought on the DEMISED PREMISES, and whenever rent, or anything reserved as rent, is unpaid, LESSOR may seize or distrain said property, on or off the premises, and sell the same on due legal notice for all rent or other payment due as rent, expenses, etc., and for all rent not due hold the same as security.

On March 31, 1976, Bollinger filed a petition for an arrangement under Chapter XI of the Bankruptcy Act in the United States District Court for the Western District of Pennsylvania at No. 76–282. At the time the Petition was filed, an order was entered by the Bankruptcy Judge staying any and all proceedings relating to Bollinger. Carl L. Bigler was appointed Receiver for Bollinger by the court and through him the Chapter XI proceedings were conducted until March 14, 1977 when Bollinger was adjudicated a bankrupt. The Receiver continued to operate Bollinger until on or about October 31, 1976 when most of the remaining employees were terminated.

On or about November 3 or 4, 1976, the Receiver discontinued any further activity at the leased premises and by November 5 had removed everything to a facility in the near vicinity owned by Bollinger. Both prior and subsequent to the removal, the Receiver and Robert G. Sable his attorney, advised both Greene and Allen that the Receiver did not intend to use the premises any longer.

On November 16, 1976, Messrs. Bigler, Sable, Allen and Greene met at the Marriott Inn to discuss various outstanding matters involving Economy and Bollinger. Areas of concern related to a forklift being held by Economy which Bollinger wanted to reacquire; administrative rent to be paid during the period of occupancy by the Receiver from April 1 through November 5; outstanding real estate taxes and other matters of a business nature. On November 23, 1976 Sable sent a letter confirming the meeting to Bigler, Allen and Greene. Greene redrafted the letter and forwarded a copy of same to Sable. Allen, on the other hand, made only a few written changes to the letter and returned it with an indication that it was "okay as noted." One of the handwritten notices provided that "Receiver will formally terminate & abandon lease on Nov. 5."

In early December of 1976, Greene took certain steps to prevent third parties from removing any items contained in the subject premises, including the steel plate owned by Luria. On or about December 1 or 2, 1976, Greene caused Economy padlocks to be placed on the primary gates leading into the subleased premises and through which the steel plate could have been removed. After a telephone discussion with counsel on December 3, 1976, Allen entered the subleased premises on December 4, 1976, through an adjoining building owned by Economy and thumbtacked a notice of distraint on a doorway leading into certain offices located within the subleased premises. The notice was signed by Allen on behalf of Economy and contained the following language:

### NOTICE OF DISTRAINT

TO: BOLLINGER CORPORATION

and

OGDEN METALS, INC.

TAKE NOTICE, that ECONOMY INDUSTRIAL PROPERTIES, owner of the premises and landlord, on December 4, 1976, distrained upon the goods and chattels of OGDEN METALS, INC., to wit, 300 tons of steel plate, more or less, located in the premises at Eleventh Street and P.C.R.R. Belt Line, Borough of Ambridge, Beaver County, Pennsylvania, for

Two Hundred Ninety-three Thousand One Hundred Forty-five and 70/100ths ($293,145.70) Dollars rent due ECONOMY INDUSTRIAL PROPERTIES. If the said rent is not paid, or replevin action instituted to recover the said goods within five (5) days after notice hreof, (sic) the undersigned may cause the said goods to be appraised and sold.

Give (sic) by the undersigned this *6th* day of December, 1976.

ECONOMY INDUSTRIAL

PROPERTIES

By /s/ Thomas R. Allen, Jr.

Partner

The $293,145.70 figure set forth in the Notice of Distraint is a total of $9,600 rent due prior to the receivership, $7,945.70 in administrative rent due during the period of receivership ($1,464.90 per month was paid by the Receiver during this period) and the balance, namely, $275,600 is accelerated rent due for the remaining period of the lease which expires on August 31, 1985.

Between November of 1976 and May 13, 1977, Luria was denied access to the subleased premises and was unable to remove the steel plate in question.

*Luria Bros. & Co. v. Allen,* 452 F.Supp. at 734–35.

The defendants have urged this Court to enter judgment n.o.v. on the claims asserted under 42 U.S.C.A. § 1983. The principal argument advanced by the defendants is that state action, a prerequisite to a finding of liability under section 1983, is lacking.

In the earlier opinion issued in this case, the Court was acting as a fact-finder and so devoted its greatest attention to determining the factual basis for liability and only briefly delineated one of the several legal foundations for the finding of state action. Because the defendants continue to passionately urge the lack of state action relying on the decision in *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978)[3], this Court is persuaded that a few additional remarks explaining its earlier opinion are in order.

The earlier decision of this Court followed the analysis suggested by the decision of *Parks v. Mr. Ford,* 556 F.2d 132 (3rd Cir. 1977). That analysis requires examination of the origin of the distraint remedy. Since distraint was determined to have statutory, rather than common law, roots, the essential prerequisite of state action existed under *Parks* through the creation of this remedy by legislative enactment. Having determined state action existed under that analysis, the Court felt no further obligation to fully express other various alternatives supporting its finding of state action. The prior opinion states, "although *Ragin* involved both a seizure and a sale of property, the Court acknowledged that a seizure alone, without appropriate procedural safeguards, could provide the basis for the deprivation of due process claim...." *Luria Bros. & Co. v. Allen,* 452 F.Supp. at 736. The decision thereafter quotes from *Ragin v. Schwartz,* 393 F.Supp. 152, 155 (W.D.Pa. 1975). It is this language, as well as the reference to *Ragin,* which indicated, albeit only implicitly, an alternative basis for finding state action to be present. To explain

---

**3.** In relying on *Flagg Bros.* defendants urge that the Court of Appeals' decision in *Parks* was implicitly overruled. Because of the factual distinctions between *Flagg Bros.,* a decision authorizing a *private sale* under the nearly universal provision of commercial law and *Parks,* a decision calling for the *public* sale of automobiles under a unique state law, this Court is reluctant to suggest that *Parks* is of necessity overruled, and leaves that to the Court authoring the *Parks* decision. This reluctance appears particularly well placed since the majority in *Flagg Bros.* was careful to exclude from the scope of its holding the "parade of horribles" suggested by Justice Stevens in dissent, a "parade" composed of state creation of statutes permitting the "strong to oppress the weak."

Though this Court would ordinarily be quite willing to make a finding that in the circumstances the instant case represents such a parade of horribles, the Court is reluctant to alter the basis for its earlier findings and prefers instead to amplify alternative grounds inherent in the earlier decision.

the perimeters of that alternative ground for decision, it is best to begin by reviewing the necessary condition supporting state action.

The decision in *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) is the most recent enunciation by the Supreme Court of what properly constitutes state action. In *Flagg Bros.* the Supreme Court was concerned with whether statutory authorization for the sale by a warehouseman of property stored in his warehouse for overdue storage charges conducted in accordance with the provisions of New York law, embodying section 7–210 of the Uniform Commercial Code, constituted state action. In finding that the enactment of legislation permitting a private sale was insufficient state action, the Supreme Court stated that, "the State of New York is in no way responsible for Flagg Brothers' decision, a decision which the State in § 7–210 *permits but does not compel*, to threaten to sell these respondent's belongings. *Flagg Bros., supra* at 165, 98 S.Ct. at 1738 (emphasis supplied). This language suggests that a different result should be reached when there is state compulsion to act.[4]

The Landlord and Tenant Act of 1951[5] has been held to inevitably compel the involvement of state officials once distraint proceedings are begun by the landlord. That holding is explicit in *Ragin v. Schwartz*, 393 F.Supp. 152 (W.D.Pa.1975). There a three judge panel considering the constitutionality of the Landlord and Tenant Act, stated in a unanimous decision,

"If the owner of personal property fails to replevy within five days after the distress and notice thereof, appraisement *must be made* of the personal property distrained upon (§ 250.308) after which the Sheriff or Constable shall fix a date, time and place for the sale, giving at least six days public notice in writing by hand bills. On that date and time, the selling officer must publicly sell the property and apply the proceeds of the sale in accordance with the fixed statutory priority relating to payment of any wages due by the tenant, payment of the charges and costs of making the distress, appraisement and sale, and finally, the satisfaction distrained, with any overplus then going for the use of the owner (§ 250.309)."

*Ragin, supra* at 155. The *Ragin* Court's determination that appraisement is an imperative requirement of section 250.308 was a considered construction of that section, to guarantee that a landlord could not place property in indefinite limbo by posting a distraint and not proceeding to sale.[6] Obviously, the *Ragin* court was construing the words, "may cause" in section 250.308 to permit an amicable resolution of the landlord's dispute with his tenant but to require a resolution within a reasonable period should private settlement prove fruitless.[7]

 This long-standing construction of the Landlord and Tenant Act inevitably calls for the involvement of state officials

---

**4.** *See also, Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).

**5.** 68 P.S. §§ 250.101–250.602.

**6.** The suggestion that property can be held in limbo at the whim of the landlord is so outlandish an interpretation that it would seem to be one of Justice Stevens' concerns in *Flagg Bros.* The ability to replevy property from limbo does not eliminate the problem since the bond represents impoundment of different property. Of even greater import is the encouragement of the breach of the peace; since an illegal distraint is of no effect, tenants are encouraged to retrieve property by force.

**7.** A similar construction seems inherent in *Gross v. Fox*, 349 F.Supp. 1164 (E.D.Pa.1972) *rev'd on other grounds* 476 F.2d 1153 (3rd Cir. 1974) since absent the inevitable state involvement it would have been impossible to find the Landlord and Tenant Act *facially* unconstitutional.

Although other Courts that considered the unconstitutionality of the Landlord and Tenant Act have not indicated the same inevitability of state involvement, no doubt that is because the challenge to the act focused on the unconstitutionality of the sale. *See, e. g. Musselman v. Spies*, 343 F.Supp. 528 (M.D.Pa.1972), *Santiago v. McElroy*, 319 F.Supp. 284 (E.D.Pa.1970).

once the landlord elects[8] to begin a distraint. Thus inevitably, the state must be called upon to assist in depriving a person of property interests without a hearing in violation of the fundamentals of due process and fully supports finding both state action and the liability of the defendant in the instant case.[9]

 The defendants have also moved for judgment n.o.v., or alternatively a new trial with respect to the claims for compensatory and punitive damages under state law. These motions will be denied. The Court has previously detailed the applicable provisions of state law and is not wont to restate its reasons. Frankly, given the facts and circumstances of this case, the resort to unconstitutional legislation to distrain the property of an innocent third party to satisfy a debt owed to the defendants by a corporation in which the defendants were the major stockholders, the award of punitive damages was more than justified. In fact, had this Court more clearly articulated the alternative grounds for its finding of state action, and the accompanying pre-existing interpretation of the Landlord and Tenant Act in its prior opinion, the plaintiffs might have shown an even greater award of punitive damages was justified.[10] However since the plaintiff has not complained, but has instead argued in favor of the amount actually awarded, the Court is not inclined to upset the verdict after the lengthy proceedings that have taken place.

The remaining contentions of the defendant in support of his various motions for judgment n.o.v. and/or a new trial with respect to the federal and/or state claims, have been considered and are found devoid of merit.

The counterclaim advanced by the defendants seeks enforcement of the distraint. This Court declines to enforce the unconstitutional Landlord and Tenant Act and so the counterclaim will be denied.

The Court has also been presented with a petition for the award of attorneys' fees. Plaintiff seeks fees both under 42 U.S.C.A. § 1988 and because of the bad faith of the defendants. Since the Court awards the amount sought under section 1988 it is unnecessary to make a finding of bad faith.

 The plaintiff, in accordance with the Lindy[11] requirements, has submitted a detailed listing of time spent on this case by his attorneys, the customary billing rates for the members of the firm who worked on this case, and the contemporaneous time records supporting those summaries.[12] Based on that evidence the Court finds the hours listed on Exhibit 238 a correct statement of the time expended on this matter. The appropriate hourly rate for each person listed on Exhibit 238 is the rate customarily charged and actually paid in this case for each of those persons creating a lodestar of $52,660 (a differing rate for each person based on the differences in ability and experience of the plaintiff legal representatives). Having considered the contingent nature of success and the quality of the work, the Court finds modification of the lodestar to be inappropriate in this case. The Court also rejects the suggestion that

---

8. The landlord *elects* to begin distraint much the same way a plaintiff elects to begin a lawsuit. By electing to distrain, the landlord impermissibly calls on the power of the state by a process akin to the election by a creditor to impermissibly garnish wages or have a prejudgment seizure of property. The landlord may of course bring an action in assumpsit for overdue rent. 68 P.S. § 250.301.

9. In fact the defendants' counterclaim seeks sale of the distrained property, thereby asking for this Court to supply "state action."

10. The distraint authorized by the Landlord and Tenant Act acts as an exception to the general rule that seizing another's goods is a

trespass. By not conforming to the requirements of the Landlord and Tenant Act, not proceeding to sale, the defendants' acts would be an intentional tort. *His World, Inc. v. Cleto M., Inc.*, 250 Pa.Super. 293, 378 A.2d 943 (1977) and 68 P.S. § 250.312.

11. *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3rd Cir. 1976).

12. Introduced as exhibits 235, 236, 236A, 237, 238.

counsel fees be modified by reference to the amount awarded or the award of punitive damages.

The last matter presented by the litigants is a dispute over the appropriate amount of costs. Defendants object to the taxing of costs (1) witness fees paid to persons deposed but not called at trial, (2) travel expenses of all persons deposed, (3) the cost of all original and copies of depositions not introduced into evidence and (4) the cost of the replevin bond posted by the plaintiff. The defendant's objections on points one, two and three will be sustained since there has been no showing why these costs should be awarded. The plaintiff will be awarded the cost of posting the replevin bond, because that cost was essential to the peaceful orderly reacquisition of the steel plate.

The foregoing shall constitute findings of fact and conclusions of law as required by F.R.Civ.P. 52(a). An appropriate order will issue.